[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11736

_____

D.C. Docket No. 2:14-cv-000476-PAM-MRM


REGIONS BANK,
an Alabama state-chartered bank,

Plaintiff–Counter Defendant–Appellee,

versus

LEGAL OUTSOURCE PA,
a Florida professional association,
PERIWINKLE PARTNERS, LLC,
a Florida limited liability company,
CHARLES PAUL-THOMAS PHOENIX,
individually, a.k.a. Charles PT Phoenix,
LISA M. PHOENIX,
individually,

Defendants–Counter Claimants–Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 28, 2019)

Before WILLIAM PRYOR, and ROSENBAUM, Circuit Judges, and MOORE,[*] District Judge.

WILLIAM PRYOR, Circuit Judge:

The main issue presented by this appeal has divided our sister circuits: whether a guarantor constitutes an "applicant" under the Equal Credit Opportunity Act. *See* 15 U.S.C. §§ 1691(a), 1691a(b). *Compare Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937 (8th Cir. 2014), *aff'd by an equally divided Court*, 136 S. Ct. 1072 (2016) (holding that a guarantor unambiguously is not an "applicant" under the Act), *and Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co.*, 476 F.3d 436 (7th Cir. 2007) (opining the same), *with RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp.*, 754 F.3d 380 (6th Cir. 2014) (holding that the term "applicant" is ambiguous and applying *Chevron* deference to an agency interpretation that a guarantor is an "applicant"). Legal Outsource PA, a law firm wholly owned by Charles Phoenix, defaulted on a loan from Regions Bank, which triggered the default of a loan and mortgage that Regions issued to Periwinkle Partners, LLC, an entity wholly owned by Charles's wife, Lisa Phoenix. After the obligors refused to cure the defaults, Regions sued to enforce its rights under the loans and mortgage. The obligors filed several counterclaims asserting that Regions violated the Equal Credit Opportunity Act by discriminating against Lisa

---

[*] Honorable K. Michael Moore, United States District Chief Judge for the Southern District of Florida, sitting by designation.

and Charles based on their marital status when it demanded that they and Legal Outsource guarantee the Periwinkle loan. The district court granted summary judgment in favor of Regions. The district court ruled that Lisa Phoenix's counterclaims failed because she lacked standing as an "applicant" when she was instead a guarantor. Because we conclude that a guarantor is not an "applicant" under the Equal Credit Opportunity Act, we affirm the summary judgment in favor of Regions. But the parties agree that we must remand to correct an error in the judgment.

## I. BACKGROUND

Beginning in 2005, Regions Bank extended a $450,000 line of credit to Legal Outsource PA, a law firm owned by Charles Phoenix. Legal Outsource renewed the loan on a yearly or semi-yearly basis, and it was last renewed in May 2013 with a maturity date in February 2014. Charles Phoenix also guaranteed the 2013 Outsource loan.

In 2011, Regions lent nearly $1.7 million to Periwinkle Partners, LLC, for the purchase of a shopping center on Sanibel Island, Florida. At that time, the sole member of Periwinkle Partners was a company owned by Charles Phoenix's wife, Lisa Phoenix. Charles Phoenix, Lisa Phoenix, and Legal Outsource all guaranteed the Periwinkle loan. Under the Periwinkle loan, a default by any of the parties,

3

including the guarantors, on any other loans that they had with Regions constitutes a default under the Periwinkle loan.

In August 2013, Regions concluded that the Outsource and Periwinkle loans were in default based on the obligors' failure to provide requested financial information and based on Periwinkle's failure to pay its property taxes. Regions then warned the obligors several times that it would accelerate the loans if the obligors failed to cure the default. In February 2014, the Outsource loan matured and Legal Outsource, which was no longer in operation, failed to pay it. Two months later, Regions declared the Outsource loan in default and demanded its full and immediate payment. According to the obligors, this declaration was a bad-faith attempt by Regions to coerce Lisa Phoenix into securing the Outsource loan with Periwinkle as collateral, but she refused to do so. After the Outsource loan default, Regions also declared the Periwinkle loan in default and demanded its full and immediate payment. The obligors never cured any of the defaults.

In August 2014, Regions filed a complaint against Charles and Lisa Phoenix, Legal Outsource, and Periwinkle Partners for breach of the Legal Outsource promissory note and guaranty, breach of the Periwinkle promissory note and guaranties, foreclosure of the Periwinkle mortgage, and receivership. The obligors answered the complaint and interposed 73 affirmative defenses and eight counterclaims.

4

The obligors twice amended the answer and added four new counterclaims that each asserted a violation of the Equal Credit Opportunity Act. The counterclaims—three of which were individually brought by Charles Phoenix, Lisa Phoenix, and Legal Outsource respectively, and one of which was brought by Lisa Phoenix and Periwinkle Partners—alleged that Regions discriminated on the basis of marital status when it required the Phoenixes and Legal Outsource to guarantee the Periwinkle loan. Regions then moved to dismiss the newly added counterclaims, and the district count granted that motion in part. The district court ruled that the guarantors of the Periwinkle loan all lacked statutory standing because they were not "applicant[s]" under the Equal Credit Opportunity Act. But the court also ruled that one of the counterclaims, which was brought on behalf of Lisa Phoenix and Periwinkle Partners, had sufficiently alleged that Lisa Phoenix and Periwinkle Partners were "applicants" under the Act, so it denied the motion as to that count.

After Regions moved for summary judgment, the district court granted summary judgment in favor of Regions both for its claims for breach of the promissory notes and guaranties and against the obligors' counterclaims. The district court ruled that the obligors "do not dispute that they were in default under the relevant notes and guaranties," and it ruled that the counterclaims had "no merit." With respect to the remaining counterclaim under the Equal Credit

5

Opportunity Act—the joint claim by Lisa Phoenix and Periwinkle—the district court ruled that Periwinkle's claim of discrimination was "frivolous" because, as an entity, it had no marital status. And the district court ruled that "[t]he claim fails as to Lisa Phoenix as well because, aside from the lack of any evidence to establish any alleged discrimination on the basis of marital status, she was not an 'applicant' for the Periwinkle loan[;] she was a guarantor." The district court referred to its earlier order ruling that guarantors were not "applicants."

The district court later issued a second summary judgment order granting foreclosure on the Periwinkle mortgage. The court then dismissed the matter with prejudice and directed the clerk to enter the judgment. The clerk entered the judgment, and the obligors filed their notice of appeal.

Regions moved to amend the judgment to state, among other things, the amounts due to Regions from the obligors. The district court granted Regions' motion in part, instructing the clerk to enter an amended judgment providing for the following relief:

> [T]he Court will order the Clerk to amend the Judgment to provide that Regions Bank prevails on its claims against Defendants. The Judgment will further provide that Regions Bank is entitled to recover $540,054.24 *from Defendants* for the Legal Outsource loan . . . .

The clerk then entered the amended judgment, and the obligors amended their notice of appeal to include the order granting Regions' motion to clarify and the amended judgment among the items subject to their appeal.

6

## II. STANDARD OF REVIEW

We review a grant of summary judgment *de novo*. *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1231 (11th Cir. 2011).

## III. DISCUSSION

This appeal presents several issues about whether the obligors are liable for the default of the Legal Outsource loan and the Periwinkle loan and mortgage. Although the obligors raise a host of issues that seek to obscure the nature of their defaults, all but one of them lack any merit, and some border on being frivolous. We decline to address them any further.

We divide our discussion of the remaining issues in two parts. First, we explain that Lisa Phoenix's counterclaims under the Equal Credit Opportunity Act fail because a guarantor does not qualify as an "applicant" under the Act. Second, we explain that a limited remand to correct erroneous language from the amended judgment is warranted.

### A. The District Court Correctly Granted Summary Judgment Against the Equal Credit Opportunity Act Counterclaims by Lisa Phoenix.

The district court did not err when it granted summary judgment against the counterclaims by Lisa Phoenix under the Equal Credit Opportunity Act. As an initial matter, although the obligors briefly mention Periwinkle's counterclaim in their argument about the Equal Credit Opportunity Act, they have failed to argue or cite caselaw in either the district court or on appeal to rebut the conclusion that

7

its status as an entity defeats its claim, as the district court ruled, so we consider that issue abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("[A]n appellant must convince us that every stated ground for the judgment against him is incorrect."). We discuss only our reasons for concluding that the district court correctly granted summary judgment against Lisa Phoenix's counterclaims on the ground that a guarantor is not an "applicant" for credit within the meaning of the Act, *see* 15 U.S.C. § 1691a(b).

The Equal Credit Opportunity Act makes it unlawful for "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of . . . marital status." *Id.* § 1691(a)–(a)(1). The Act defines an "applicant" as "any person who *applies* to a creditor directly for . . . credit, or *applies* to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." *Id.* § 1691a(b) (emphases added). The Act initially required the Federal Reserve Board to promulgate regulations to enforce the Act. *See* 15 U.S.C. § 1691b (1974). And the Federal Reserve Board promulgated Regulation B, which defines an applicant as "any person who requests or who has received an extension of credit from a creditor," which includes "any person who is or may become contractually liable regarding an extension of credit." 12 C.F.R. § 202.2(e). That regulation further provides that the term "applicant" includes "*guarantors*, sureties, endorsers, and similar parties." *Id.*

8

(emphasis added). Regulation B also prohibits a creditor from requiring the signature of an applicant's spouse, other than a joint applicant, on any credit instrument if the applicant independently qualifies as creditworthy. *Id.* § 202.7(d)(1).

The obligors rely on the definition of "applicant" in Regulation B to argue that Lisa Phoenix has statutory standing under the Act, so we must determine whether we should defer to this regulation under the two-step framework announced in *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Arevalo v. U.S. Att'y Gen.*, 872 F.3d 1184, 1187–88 (11th Cir. 2017). First, we ask whether, after applying the "traditional tools of statutory construction," we can determine whether Congress has spoken clearly on the issue. *Barton v. U.S. Att'y Gen.*, 904 F.3d 1294, 1298 (11th Cir. 2018) (quoting *Fajardo v. U.S. Att'y Gen.*, 659 F.3d 1303, 1307 (11th Cir. 2011)). If the statute is unambiguous, we apply it according to its terms and give no deference to the administrative interpretation. *Arevalo*, 872 F.3d at 1188. Second, "if the statute is silent or ambiguous with respect to the specific issue presented, we must then determine whether the agency's interpretation is reasonable or based on a permissible construction of the statute." *Id.* An interpretation is reasonable if it is "rational and consistent with the statute." *Id.* (quoting *Sullivan v. Everhart*, 494 U.S. 83, 89 (1990)).

9

In applying the "traditional tools of statutory construction," we begin "with the statutory text, and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Barton*, 904 F.3d at 1298 (quoting *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 6, at 69 (2012) ("Words are to be understood in their ordinary, everyday meaning—unless the context indicates that they bear a technical sense."). And we interpret the words of a statute based on their meaning at the time of enactment. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019); Scalia & Garner, *Reading Law* § 7, at 78 ("Words must be given the meaning they had when the text was adopted.").

The Act, which was adopted in 1974, defines an applicant as "any person who *applies* to a creditor directly for . . . credit, or *applies* to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b) (emphases added). English-language dictionaries both before and after the enactment define the term "apply" to refer to a request for something. *See Apply*, 1 *The Oxford English Dictionary* 407 (corr. reprint 1961) (1933) ("To address oneself for information or aid, to have recourse, to make application to"); *Apply*, 1 *The Oxford English Dictionary* 577 (2d ed. 1989) (same); *Apply*, *Webster's New International Dictionary of the English*

10

*Language* (*Webster's Second*) 132 (2d ed. 1961) ("To make request; to have recourse with a view to gain something; to solicit"); *Apply*, *Webster's New Collegiate Dictionary* 55 (1977) ("[T]o make an appeal or request esp[ecially] in the form of a written application."). So too do legal dictionaries. *See Apply*, *Black's Law Dictionary* 128 (rev. 4th ed. 1968) ("To make a formal request or petition, usually in writing, to a court, officer, board, or company, for the granting of some favor, or of some rule or order, which is within his or their power or discretion"); *Application*, *id.* at 127 ("The act of making a request for something"). The Sixth and Eighth Circuits have also both cited a definition of the term "apply" as meaning "a request . . . *usually for something of benefit to oneself.*" *See Hawkins*, 761 F.3d at 941 (alteration adopted) (emphasis added) (quoting *Webster's Third New Int'l Dictionary* 105 (2002)); *RL BB*, 754 F.3d at 385 (quoting *Webster's Third New Int'l Dictionary* 105 (1993)); *see also Apply*, *Webster's Third New Int'l Dictionary* 105 (1971) (defining "apply" as "to make an appeal or a request esp[ecially] formally and often in writing and usu[ally] for something of benefit to oneself"). So, taken together, these definitions suggest that the ordinary meaning of the term "applicant" is one who requests credit to benefit himself.

A guarantor does not fit within this definition. At the time of enactment, English-language dictionaries defined "guaranty" to mean a promise by a guarantor to answer for the payment of some debt if the person liable in the first

11

instance is unable to pay. *See Guaranty*, 4 *The Oxford English Dictionary* 477 (corr. reprint 1961) (1933) ("a written undertaking made by a person (called the *guarantor*) to be answerable for the payment of a debt or the performance of an obligation by another person, who is in the first instance liable to such payment or obligation"); *Guaranty*, 6 *The Oxford English Dictionary* 912 (2d ed. 1989) (same); *Guaranty*, *Webster's Second* 1110 ("An undertaking to answer for the payment of some debt, or the performance of some duty, of another, in case of the failure of such other to pay or perform"); *Guaranty*, *Webster's New Collegiate Dictionary* 509 ("[A]n undertaking to answer for the payment of a debt or the performance of a duty of another in case of the other's default or miscarriage"). Legal dictionaries defined "guaranty" the same way. *See Guaranty*, *Black's Law Dictionary* 833 (rev. 4th ed.) ("A promise to answer for payment of debt or the performance of obligation if person liable in the first instance fails to make payment or perform obligation"); *Guarantor*, *Black's Law Dictionary* 634 (5th ed. 1979) ("One who becomes secondarily liable for another's debt or performance"). Although a guarantor makes a promise related to an applicant's request for credit, the guaranty is not itself a request for credit, and certainly not a request for credit for the guarantor. *See Hawkins*, 761 F.3d at 942 ("We find it to be unambiguous that assuming a secondary, contingent liability does not amount to a request for credit.").

12

To be sure, as the dissent points out, a guarantor's promise supports a would-be debtor's loan application and ordinarily stems from the guarantor's desire that the application be granted. *See* Dissenting Op. at 62–63. But to say that a guarantor requests credit by supporting another's request for credit is to push the bounds of ordinary usage—at the very least, it is to use one word in two obviously different senses. And to say that the guarantor *applies* for credit by supporting *another's* application is to leave ordinary usage behind entirely.

An example should make this point clear. Suppose a high-school senior is applying to her parents' alma mater, and her parents—who happen to be wealthy donors—promise the school that they will make a large gift if their daughter is admitted. The parents' promise supports the daughter's application for admission, just as a guarantor's promise supports a loan applicant's application for credit. The parents will be grateful if their daughter is admitted, as a guarantor ordinarily is grateful when the debtor's application for credit is granted. But it would be unnatural to say that the parents have "applied" for their daughter's admission or to call them "applicants" for admission. Under any ordinary use of the word, the student is the only "applicant" in this scenario.

Applying the whole-text and consistent-usage canons to the Act further confirms that the term "applicant" excludes guarantors. The whole-text canon refers to the principle that a "judicial interpreter [should] consider the entire text, in

13

view of its structure and of the physical and logical relation of its many parts," when interpreting any particular part of the text. Scalia & Garner, *Reading Law* § 24, at 167. "Properly applied, it typically establishes that only one of the possible meanings that a word or phrase can bear is compatible with use of the same word or phrase elsewhere in the statute . . . ." *Id.* at 168. Closely related to the whole-text canon is the principle that "[a] word or phrase is presumed to bear the same meaning throughout a text" unless context requires otherwise. *Id.* § 25, at 170; *accord Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) ("Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning.").

As Judge Colloton explained in his concurring opinion in *Hawkins*, three aspects of the statutory text strongly suggest that the term "applicant" is only compatible with "a first-party applicant who requests credit to benefit herself." *Hawkins*, 761 F.3d at 943 (Colloton, J., concurring). First, the Act uses the term "applicant" in several provisions that can only refer to a first-party applicant. For example, section 1691 speaks of a "completed application for credit," 15 U.S.C. § 1691(d)(1), and of a creditor taking action in connection with the "applicant's application for a loan," *id.* § 1691(e)(1). We agree that "it would be unnatural to conclude that a third party who offers a promise in support of an applicant thereby submits what the statute describes as an 'application for a loan,' and a 'completed

14

application for credit.'" *Hawkins*, 761 F.3d at 943–44 (Colloton, J., concurring) (citations omitted). Similarly, the Act provides that within thirty days "after receipt of a completed application for credit, a creditor shall notify *the applicant* of its actions on the application." 15 U.S.C. § 1691(d)(1) (emphasis added). "The statute's use of the definite article shows that applicant is the single person to whom credit would be extended, not a third party asking on behalf of the putative debtor." *Hawkins*, 761 F.3d at 943 (Colloton, J., concurring). In contrast with these provisions, we are aware of no instance in which the Act refers to an "applicant" in a context that would naturally suggest that a third-party guarantor could qualify.

Second, the statutory definition of "adverse action" on a credit application excludes from that phrase "a refusal to extend additional credit *under an existing credit arrangement where the applicant is delinquent or otherwise in default.*" 15 U.S.C. § 1691(d)(6) (emphasis added). This provision suggests that "the applicant" has received credit and is responsible for making payments on an existing loan. "A guarantor or other third-party requestor does not in ordinary usage become 'delinquent' or 'in default' on a loan or other existing credit arrangement." *Hawkins*, 761 F.3d at 944 (Colloton, J., concurring). And "if a guarantor could be an 'applicant,' then the creditor's refusal to extend additional credit to a delinquent borrower would be an 'adverse action' on the *guarantor's* 'application,' thus entitling the third-party guarantor to a statement of reasons that the creditor need

15

not furnish to the first-party applicant. [15 U.S.C.] § 1691(d)(2)." *Id.* As Judge Colloton concluded, "This is not a natural reading of the text." *Id.*

Third, the Act recognizes that third parties can be involved in requesting an extension of credit to a first-party applicant, but it "distinguishes between the third-party requestor and the 'applicant.'" *Id.* The Act provides that "[w]here a creditor has been *requested by a third party* to make a specific extension of credit directly or indirectly *to an applicant*, the notification and statement of reasons required by this subsection may be made directly by such creditor, or indirectly *through the third party*, provided in either case that the identity of the creditor is disclosed." *Id.* (alterations adopted) (quoting 15 U.S.C. § 1691(d)(4)). That Congress chose to use the term "applicant" to refer to the party receiving the credit and "third party" to refer to a separate party who requests an extension of credit for the "applicant" is telling. In short, after examining the term "applicant" in the context of the statute as a whole, we conclude that there is ample evidence that the term bears the ordinary meaning of a person who requests a benefit for himself.

Two of the three of our sister circuits that have considered whether the administrative interpretation of the term "applicant" deserves *Chevron* deference have also concluded that the Act unambiguously excludes guarantors. *See Hawkins*, 761 F.3d at 942 (rejecting *Chevron* deference and explaining "[w]e find it to be unambiguous that assuming a secondary, contingent liability does not

16

amount to a request for credit"); *Moran*, 476 F.3d at 441 ("[T]here is nothing ambiguous about 'applicant' and no way to confuse an applicant with a guarantor."). *But see RL BB,* 754 F.3d at 385 (applying *Chevron* deference to section 202.2(e) on the theory that the term "applies" is ambiguous and that guarantors qualify as requesting credit because they "make formal requests for aid in the form of credit for a third party"). Because we agree with the Seventh and Eighth Circuits that the ordinary meaning of "applicant" does not encompass a guarantor, we hold that no deference is due section 202.2(e). So the district court correctly granted summary judgment against the counterclaim by Lisa Phoenix's because she was not an "applicant" under the Act.

The dissenting opinion disagrees with our analysis of the meaning of the term "applicant" under the Act on three grounds. First, the dissent argues that the ordinary meaning of the word "applicant" reasonably includes guarantors. Dissenting Op. at 60–63. Second, the dissent contends that our analysis fails to reflect the "overriding national policy against discrimination that underlies the [ECOA]." *Id.* at 76 (alteration in original) (internal quotation marks omitted). Along the way to that conclusion, the dissent relies on two favorites of purposivists: the notion that the Act, as a remedial statute, must be construed broadly, *id.* at 49–51, 61, 65–71, 76, and the notion that the words of the Act must be construed in the light of the Act's overall purpose, *id.* at 76. Finally, the dissent

17

contends that Congress acquiesced to the Board's definition of "applicant" by failing to amend the Act to expressly preclude the Board's definition. *Id.* at 79–82. None of these reasons is persuasive.

The dissent's analysis begins by focusing on how the word "any" appears four times in two relevant sentences of the Act. *Id.* at 60–61 (quoting 15 U.S.C. § 1691(a)(1) (making it "unlawful for *any* creditor to discriminate against *any* application, with respect to *any* aspect of a credit transaction . . . ." (emphases added)); *id.* § 1691a(b) (defining "applicant" to mean "*any* person who applies to a creditor directly for . . . credit" (emphasis added))). The dissent argues that the repeated use of the word "any" suggests that Congress intended for the statute to have expansive reach and that we should not "engraft artificial limitations" to curb the "expansive remedial purposes" of the Act. *Id.* at 61 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982)). If all the dissent is arguing is that we should not go beyond the ordinary meaning of the term "applicant" to narrow it artificially, we agree entirely.

But the use of the word "any" does not change the meaning of the term "applicant." We have repeatedly explained that when Congress uses the word "any" without "language limiting the breadth of that word, 'any' means all." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001) (alteration adopted) (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186

18

(11th Cir. 1997)). So when the Act speaks of an applicant as "*any* person who applies to a creditor directly for . . . credit," the word "any" signifies only that *all* persons who apply to a creditor directly for credit qualify. The word or term that is modified by "any" is still defined by its ordinary meaning. *See, e.g.*, *id.* (using dictionary definitions to interpret the word "termination" from "any termination"). So the relevant question remains what the ordinary meaning of the term "person who applies to a creditor directly for . . . . credit" includes.

The dissent's attempt to answer this question leans heavily on the definition of "apply" as "to make an appeal or request . . . *usually for something of benefit to oneself.*" Dissenting Op. at 62 (emphasis altered) (quoting *Hawkins*, 761 F.3d at 941 (quoting *Webster's Third New Int'l Dictionary* at 105 (1993)). The dissent reasons, "[o]bviously, if something is '*usually* for something of benefit to oneself,' it must *sometimes* be for something of benefit to another." *Id.* (emphasis altered). So, the dissent concludes, the word "applicant" can fairly be interpreted to include a guarantor.

Yet the definition the dissent relies on proves the opposite. As Judge Colloton pointed out in his concurrence in *Hawkins*, "under th[e] usual meaning, an 'applicant' who 'applies for credit' is one who requests credit to benefit herself, not credit to benefit a third party. That there are unusual meanings of 'apply' that encompass making a request on behalf of another is not sufficient to make a term

19

ambiguous for purposes of *Chevron*." 761 F.3d at 943 (Colloton, J., concurring). The only circumstance in which it is reasonable to construe a term according to an unusual meaning is when the context makes the unusual meaning a natural one. But, as we have explained, there is nothing natural about calling a guarantor an applicant for credit, and the whole text of the Act makes that usage even less plausible.

The dissent charges that our reading of the Act fails to apply the whole-text canon, Dissenting Op. at 65–66, 66 n.20, but the dissent's assertion is notably lacking in references to the text. According to the dissent, if we viewed the Act as a whole, we would see that "'[t]he overriding national policy against discrimination that underlies the [Act]' means that 'we cannot give' words in that statute a 'narrow interpretation.'" *Id.* at 76 (quoting *Bros. v. First Leasing*, 724 F.2d 789, 793 (9th Cir. 1984)). But apart from its logically irrelevant reliance on the word "any," the dissent fails to point to any other provisions of the Act that suggest that the term "applicant" includes a third party who requests a benefit for the first-party applicant. And it is hornbook abuse of the whole-text canon to argue "that since the overall purpose of the statute is to achieve *x*, any interpretation of the text that limits the achieving of *x* must be disfavored." Scalia & Garner, *Reading Law* § 24, at 168.

20

The dissent also contends that we fail to reconcile our reading of the text with the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." Dissenting Op. at 65 (internal quotation marks omitted) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). Indeed, we do not apply this so-called canon because it is of dubious value. An eight-member majority of the Supreme Court has ridiculed it as "th[e] last redoubt of losing causes," *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135 (1995), and the Court has rejected applying it in a number of other decisions since 1995. *See, e.g.*, *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014) ("The Court of Appeals supported its interpretation of [section] 9658 by invoking the proposition that remedial statutes should be interpreted in a liberal manner. The Court of Appeals was in error when it treated this as a substitute for a conclusion grounded in the statute's text and structure."); *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 171 (2007) (rejecting argument based on remedial-purpose canon and explaining that although a statute's remedial purpose was to benefit employees, "this remedial purpose [does not] require[] us to interpret every uncertainty in the Act in favor of employees"); *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 237, 244 (2004) (reversing court of appeals that relied on remedial-purpose canon to broadly interpret the term "finance charge" from the Truth in Lending Act); *Inyo Cty. v.*

21

*Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 710–12 (2003) (rejecting argument based on the remedial-purpose canon that the term "person" should be construed broadly under a statute to include Native American tribes). As the Supreme Court has recently explained, the fundamental problem with this so-called canon is its indeterminate coverage, as "almost every statute might be described as remedial in the sense that all statutes are designed to remedy some problem." *CTS Corp.*, 573 U.S. at 12. And the "canon" too is of indeterminate effect because, "even if the Court [has] identified some subset of statutes as especially remedial, [it] has emphasized that no legislation pursues its purposes at all costs." *Id.* (citation and internal quotation marks omitted).

Indeed, it is hard to imagine a more widely criticized "canon" of interpretation. A leading treatise has labeled it a "false" canon and has explained that it is "an open invitation to engage in 'purposive' rather than textual interpretation, and generally to engage in judicial improvisation." Scalia & Garner, *Reading Law* § 64, at 364–66. And jurists as varied as Antonin Scalia and Richard Posner share the same view. *See* Antonin Scalia, *Assorted Canards of Contemporary Legal Analysis*, 40 Case W. Res. L. Rev. 581, 581 (1990) (calling the canon one of "the prime examples of lego-babble"); Richard A. Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U. Chi. L. Rev. 800, 809 (1983) (explaining that the canon is "unrealistic about legislative

22

objectives" because it assumes that legislatures pursue a single remedial purpose, when in reality a "statute [often] is a compromise between one group of legislators that holds a simple remedial objective but lacks a majority and another group that has reservations about the objective"). We agree with these authorities that we should not employ this false canon to contravene the text of the Act.

The dissent also insists that we must "construe the literal language of the [Act]" in the light of the "overriding national policy against discrimination that underlies the [Act]." Dissenting Op. at 76 (quoting *First Leasing*, 724 F.2d at 793). We take no issue with the dissent's explanation of the vital role that women have played in our nation's history, of the discrimination they have faced in obtaining credit, and that one of the purposes of the Act was to remedy this discrimination. *See* Dissenting Op. at 51–60. But the dissent ignores that "[n]o legislation pursues its purposes at all costs," and that "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646–47 (1990) (quoting *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987)). When a statute includes limiting provisions, those provisions "are no less a reflection of the genuine 'purpose' of the statute than the operative provisions, and it is not the court's function to alter the legislative compromise." Scalia & Garner, *Reading Law* at 21. Here, Congress created a right that runs only to

23

"applicants." And as the Seventh Circuit explained in *Moran*, because the term "applicant" unambiguously does not encompass "guarantors," reading the statute in the way the dissent does would frustrate the limitations that Congress imposed on statutory standing and "opens vistas of liability" that Congress did not envision. 476 F.3d at 441.

The dissent's final substantive argument is that Congress has impliedly adopted the Board's definition of "applicant" by amending the Act without changing the statutory definition during the 30 years since Regulation B was first promulgated. Dissenting Op. at 79–82. Although the Supreme Court has recognized that congressional inaction can, in limited circumstances, support an inference that Congress has acquiesced to an agency or judicial interpretation, it has explained that "[l]egislative silence is a poor beacon to follow" in construing a statute. *Zuber v. Allen*, 396 U.S. 168, 185 (1969). And it has repeatedly warned that congressional silence alone is ordinarily not enough to infer acquiescence. *See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs,* 531 U.S. 159, 169 (2001) ("Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care."); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985) ("[W]e are chary of attributing significance to Congress' failure to

act . . . ."); *Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983)

("Nonaction by Congress is not often a useful guide . . . .").

The dissent cites *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), in arguing that we should infer congressional acquiescence, Dissenting Op. at 79–80, but this reliance is misplaced. There, the Supreme Court held that when Congress amended the Fair Housing Act in 1988, it was aware of and adopted the unanimous view of nine circuits that had considered the matter and concluded that the statute authorized disparate-impact claims. *See Texas Dep't of Hous.*, 135 S. Ct. at 2519.

The dissenting opinion contends that until 2014, the "vast majority of courts" that had "examined" the issue held that guarantors had standing under the Equal Credit Opportunity Act, Dissenting Op. at 80 (quoting *RL BB*, 754 F.3d at 386), but this argument is misleading. Before 2007, several federal and state courts applied Regulation B, but they did so without discussing whether it was entitled to deference. *See, e.g.*, *Silverman v. Eastrich Multiple Inv'r Fund, L.P.*, 51 F.3d 28, 30–31 (3d Cir. 1995) (assuming without discussion that the Board's interpretation was valid); *Fed. Deposit Ins. Corp. v. Medmark, Inc.*, 897 F. Supp. 511, 514 (D. Kan. 1995) (same); *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (explaining that a decision is not precedential with respect to an issue "not there raised in briefs or argument nor discussed in the opinion of the

25

Court"). To our knowledge, the first court to "examine[]" whether the Board's definition deserved deference was the Seventh Circuit in *Moran*, in 2007, and it concluded that it did not. *See* 476 F.3d. at 441. By the time Congress next amended the Act in July 2010, the only other courts to opine on the issue were a federal district court, which agreed with *Moran* and ruled that guarantors lack statutory standing, *see Champion Bank v. Reg'l Dev., LLC*, No. 4:08-cv-1807-CDP, 2009 WL 1351122, at *3 (E.D. Mo. May 13, 2009) (reasoning that "a guarantor does not, by definition, apply for anything"), and the Supreme Court of Iowa, which applied Regulation B without considering *Moran* or whether it was entitled to deference, *see Bank of the West v. Kline*, 782 N.W.2d 453, 458 (Iowa 2010). So when Congress amended the Act in 2010, the weight of reasoned authority was *against* the Board's definition of applicant. And Congress's prior amendments to the Act took place before any court had considered the validity of Regulation B. This situation obviously is nothing like the unanimous, reasoned precedent of nine circuits in favor of an agency interpretation featured in *Texas Department of Housing*. We can hardly infer congressional acquiescence in this circumstance.

The dissent advances one other objection to our analysis: that it "opine[s] on an issue that . . . Lisa Phoenix and Periwinkle . . . never raised on appeal." Dissenting Op. at 35. As the dissent sees it, Lisa Phoenix has abandoned both of

26

her counterclaims by failing to raise them "plainly and prominently" enough in the obligors' initial brief. *Id.* at 38 (quoting *Sapuppo*, 739 F.3d at 681). We disagree.

To be sure, the obligors' briefing could most charitably be described as clumsy. We emphatically "do not condone the unartful way in which [the obligors] ha[ve] stated and argued the issues on this appeal." *Fed. Sav. & Loan Ins. Corp. v. Haralson*, 813 F.2d 370, 373 n.3. (11th Cir. 1987). Even so, reading their initial brief in the light of the record, the other briefs in this appeal, and the principle that "briefs should be read liberally to ascertain the issues raised on appeal," *Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994), we have no doubt that Lisa Phoenix has fairly presented the argument that the district court erred when it dismissed at least one of her counterclaims relating to the Periwinkle loan based on her status as a guarantor.

Consider what happened in the district court. The obligors pleaded four counterclaims under the Equal Credit Opportunity Act based on the Periwinkle loan: one by Charles Phoenix, one by Legal Outsource, one by Lisa Phoenix and Periwinkle Partners jointly, and one by Lisa Phoenix individually. Citing *Hawkins* for the proposition that guarantors are not applicants, the district court dismissed the claims by Charles Phoenix, Legal Outsource, and Lisa Phoenix individually on the ground that those claims rested solely on guarantor standing. But the district court withheld judgment on the joint claim by Lisa Phoenix and Periwinkle

27

because that claim—counterclaim 11—appeared to allege that both Lisa Phoenix and Periwinkle were applicants. After further considering the matter, the district court granted summary judgment against counterclaim 11 on the grounds that Lisa Phoenix lacked standing and that Periwinkle had no marital status. The district court also mentioned "the lack of any evidence to establish any alleged discrimination on the basis of marital status," which was a sufficient alternative basis for the summary judgment, although the district court did not clearly designate it as such.

Now consider the briefs. In a discrete section of their initial brief, the obligors protest the district court's "reli[ance] . . . on the Eighth Circuit's ruling in *Hawkins*" "to substantiate dismissing Lisa Phoenix's and Periwinkle's claims" under the Equal Credit Opportunity Act. Initial Br. of Appellants at 30. And they argue that the regulation defining the term "applicant" to include guarantors, *see* 12 C.F.R. § 202.2(e), is a valid exercise of regulatory power to implement the Act. Initial Br. of Appellants at 31–32. They conclude that the claims by "Lisa Phoenix and Periwinkle" "fall squarely within ECOA's protections." *Id.* at 32.

Logically, this argument can relate only to counterclaim 11—the joint claim by Lisa Phoenix and Periwinkle—or counterclaim 12—Lisa Phoenix's individual claim as a guarantor of the Periwinkle loan. That the brief refers to both Lisa Phoenix and Periwinkle suggests that the obligors might have counterclaim 11 in

mind, but the district court did not rely on *Hawkins* to dismiss any claim by Periwinkle. But, with respect to Lisa Phoenix, the argument responds squarely to the primary basis on which the district court dismissed her share of counterclaim 11 and the sole basis on which it dismissed her counterclaim 12. In this circumstance, we cannot agree with the dissent that "no claim is properly before us on appeal." Dissenting Op. at 35.

Consider the consequences if we accepted the obligors' argument—that is, if the obligors convinced us that the district court erred when it "relied . . . on the Eighth Circuit's ruling in *Hawkins* to substantiate dismissing Lisa Phoenix's and Periwinkle's claims" because, contrary to *Hawkins*, guarantors are applicants under the Act. Initial Br. of Appellants at 30. In that case, they necessarily would have convinced us that "every stated ground for the judgment against [counterclaim 12] is incorrect," which is exactly what we have said an appellant must do "[t]o obtain reversal of a district court judgment." *Sapuppo*, 739 F.3d at 680. They also would have convinced us that the primary and arguably the only "stated ground for the judgment against [counterclaim 11] is incorrect." *Id.* So, unless some alternative ground for affirmance appeared from Regions' brief or from the record, accepting the obligors' argument would require us to reverse the dismissal of counterclaim 12 at least and perhaps counterclaim 11 as well.

We consider it telling that Regions agrees with us, at least in part, that the obligors have raised the issue of guarantor standing. In its brief, Regions contends that the obligors "have waived or abandoned any issue or argument with respect to the dismissal of [counterclaims] IX, X, and XII." Br. of Appellee Regions Bank at 34. But Regions does *not* contend that the obligors have abandoned counterclaim 11 or the general issue of guarantor standing. On the contrary, it reads the obligors' brief to "contend . . . that summary judgment for Regions on Counterclaim count XI was in error because, under the definition of 'applicant' supplied in Regulation B [the governing regulation], Mrs. Phoenix possessed standing to sue in her capacity as a guarantor of the Periwinkle loan." *Id.* Regions proceeds to argue on the merits that the district court correctly granted summary judgment against counterclaim 11 because the obligors have produced no evidence of discrimination and because guarantors are not applicants. *See id.* at 35–42.

That Regions does not share the dissent's view that Lisa Phoenix "indisputably abandoned" counterclaim 11 is relevant in two respects. Dissenting Op. at 41. First, even if Lisa Phoenix waived or forfeited counterclaim 11 in her initial brief, Regions has waived or forfeited the waiver or forfeiture by conceding in its own brief that she raised it. And nothing Regions said at oral argument can undo that concession. *See APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d

1261, 1269 (11th Cir. 2007) ("[W]e do not consider claims not raised in a party's initial brief and made for the first time at oral argument.").

The second way in which Regions' concession matters is that the main principle that animates the abandonment rule is fair notice. As we have explained, "an appellee is entitled to rely on the content of an appellant's brief for the scope of the issues appealed." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (quoting *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir. 1983)); *accord Haralson*, 813 F.2d at 373 n.3. That Regions thought the obligors raised counterclaim 11 in their brief—even as it concluded that they had abandoned other claims—suggests that the obligors' brief gave Regions fair notice that counterclaim 11 was an issue.

To be sure, an appellee's assertions about what is or is not abandoned do not bind us. Claims of abandonment may often be overstated; in this appeal, we are not sure we agree with Regions that Lisa Phoenix has abandoned counterclaim 12. And there are many reasons why appellees may fail to raise meritorious abandonment arguments. But the point remains: that Regions understood the obligors' brief to present a live argument about counterclaim 11 and the general issue of guarantor standing is surely evidence that it is reasonably understood to do so.

Consider also that both amicus briefs—one by the Consumer Financial Protection Bureau and one by five bankers associations—fully briefed the issue of

31

Lisa Phoenix's guarantor standing under the Act. Neither brief ever hinted at the possibility that Lisa Phoenix abandoned her counterclaims. That all of the amici, like Regions, consider Lisa Phoenix to have adequately raised the issue of her statutory standing reinforces our conclusion that Lisa Phoenix did not abandon her argument about counterclaims 11 and 12.

Our dissenting colleague's contention that Lisa Phoenix has abandoned her counterclaims turns on her reading—which we respectfully submit is an overreading—of three sentences in the obligors' brief, each of which seems to suggest that the Equal Credit Opportunity Act claim on appeal is that Regions violated the Act when it allegedly demanded that Lisa Phoenix guarantee the Outsource loan. *See* Dissenting Op. at 38–39. The obligors' statement of the issues presents the question, "Does a wife who refuses to collateralize loans or guaranty *her husband's unsecured business debt* have Equal Credit Opportunity Act (ECOA) standing as an 'applicant' . . . ?" Initial Br. of Appellants at 1 (emphasis added). Then, in their argument section, the obligors protest that excluding guarantors from the definition of "applicant" "gives lenders an untethered license to require spouses to collateralize and sign *for their husbands' loans* with impunity," and they contend that Lisa Phoenix was required "to sign for and collateralize *her husband's business debts*." *Id.* at 30, 32 (emphases added). As the dissent sees it, these phrases can mean only that Lisa Phoenix has replaced her

32

counterclaims based on the Periwinkle claim with a wholly novel claim based on

Regions' alleged demand that she guarantee the Outsource loan, even though the

obligors never pleaded such a claim in the district court and no such claim is

concerned in the judgment on appeal, and even though it would be nonsensical for

Lisa Phoenix to assert guarantor standing with respect to a loan she never

guaranteed.

Although we certainly agree that the obligors' brief is no model of clarity,

we do not think that its references to the Outsource loan nullify Lisa Phoenix's

challenge to the ground on which her counterclaims were dismissed. In the

obligors' telling of the facts, Regions demanded that Lisa Phoenix collateralize the

Outsource loan, she refused, and Regions punished her refusal by declaring falsely

that the Periwinkle loan was in default. We read the phrases on which the dissent

leans as highlighting the crucial narrative role of Regions' demand and Lisa

Phoenix's refusal in the obligors' version of the facts, not as obliterating her legal

theory. And we do not see how we can read them any other way without violating

the rule that "briefs should be read liberally to ascertain the issues raised on

appeal." *Swann*, 27 F.3d at 1542. The abandonment rule would swell to a scope

previously unimagined if we were to hold that an appellant abandons her legal

theory whenever she places undue emphasis on one part of her factual narrative

over another. We conclude that Lisa Phoenix has preserved at least one of her

33

counterclaims under the Equal Credit Opportunity Act and that the issue of guarantor standing is before us. And, for the reasons we have explained, we hold that the district court correctly granted summary judgment against those counterclaims because a guarantor is not an "applicant" for credit under the Act.

*B. The Amended Judgment Must Be Corrected on Remand.*

The amended judgment states "that Regions Bank is entitled to recover $540,054.24 *from Defendants* for the Legal Outsource loan." As both parties agreed at oral argument, the counts regarding the Legal Outsource loan name only Charles Phoenix and Legal Outsource as defendants, so the judgment erroneously states that Lisa Phoenix and Periwinkle Partners are also liable for the Outsource loan. We remand with instructions to correct the judgment to state that only Charles Phoenix and Legal Outsource are liable for the damages owed for the default of the Outsource loan.

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of Regions, and we **REMAND** with instructions to correct the judgment.

34

ROSENBAUM, Circuit Judge, concurring in part and dissenting in part:

Today we opine on an issue that Appellants Lisa Phoenix and Periwinkle Partners LLC ("Periwinkle") never raised on appeal. Courts have noted that deciding an issue no appellant raised is generally unwise. But the Majority Opinion nevertheless insists that we do so. And in following this course, it purports to constrict the Equal Credit Opportunity Act ("ECOA") to preclude it from accomplishing one of its primary remedial goals: disentangling spouses' financial intertwinement when such intertwinement is not necessary. I therefore feel it necessary to explain the problems with the Majority Opinion's analysis.

Section I of this dissent demonstrates that no claim is properly before us on appeal. And Section II responds to the Majority Opinion's incorrect conclusion that guarantors lack standing as "applicants" under the ECOA.

## I.

At different points in this litigation, Defendants-Counterclaimants-Appellants Lisa Phoenix and Periwinkle have arguably raised two ECOA claims possibly relevant to this appeal.[1] Each claim involves a separate Regions Bank loan.

---

[1] The other Defendants-Counterclaimants-Appellants' claims are not relevant to the ECOA analysis the Majority Opinion has chosen to conduct, so I do not address them here.

The Majority Opinion construes the claim on appeal to concern a loan Regions made to Periwinkle, a company Lisa Phoenix indirectly owns. As the Majority Opinion interprets this claim, Lisa Phoenix invokes the ECOA to contest Regions's demand that her husband, Charles Phoenix, and his law firm, Legal Outsource PA, guaranty the Periwinkle loan ("Periwinkle Loan Claim").

The second potential ECOA claim possibly relevant on this appeal involves a loan Regions made to Legal Outsource. Under this potential claim, Lisa[2] asserts that Regions violated the ECOA when it required her (through her company Periwinkle) to guaranty a loan it had made to her husband Charles's business, Legal Outsource ("Legal Outsource Loan Claim").

But neither the Periwinkle Loan Claim nor the Legal Outsource Loan Claim is properly presented on appeal.

To understand why, it makes sense to start by looking at the sole ECOA claim Lisa identified in the issues she presented on appeal: "Does a wife who refuses to collateralize loans or *guaranty **her husband's** unsecured business debt* have [ECOA] standing as an 'applicant' to sue if the lender then forces over a dozen technical defaults as pretense to falsely accelerate and foreclose on her separate secured loan?" Appellants' Br. at 1 (emphasis added). This language unambiguously seeks to assert Lisa's status as an "applicant" on the Legal Outsource

---

[2] To avoid confusion, I refer to Charles and Lisa Phoenix by their first names.

Loan Claim, as a result of Periwinkle's legal status as a guarantor for that loan, since only the Legal Outsource Loan Claim involved an alleged demand by Regions to guaranty Lisa's husband's business debt. The language of the issue as Lisa has phrased it on appeal does not implicate the Periwinkle Loan Claim, since that was a loan involving Lisa's own business, not her husband's business.

Lisa's actual argument in support of her ECOA claim also leaves no doubt that she challenges only Regions's demand that she (through her company Periwinkle) guaranty her husband's Legal Outsource Loan. Her argument is short; it's less than three pages. But in that space she repeatedly argues that Regions violated the ECOA by trying to make her guaranty her husband's loans. Appellants' Br. at 30, 32. Unfortunately for Lisa, though, she did not raise the Legal Outsource Loan Claim in the district court.

As for the Periwinkle Loan Claim, Lisa never once argues it in this appeal. True, the loan to Periwinkle comes up in her briefs, but only in the context of arguments that the Majority Opinion (correctly) decides are meritless, if not "frivolous." Maj. Op. at 7. Significantly, she never argues that the district court was wrong in finding she lacked standing as a guarantor to contest the Periwinkle Loan Claim.

So what exactly is properly on appeal?

Nothing.

We have repeatedly explained that "[a]ny issue that an appellant wants the Court to address should be specifically and clearly identified in the brief." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).[3] Not only that, but "[a] party fails to adequately brief a claim when he does not plainly and prominently raise it, for instance by devoting a discrete section of his argument to those claims." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (citation and internal quotation marks omitted). When that happens, "the issue—even if properly preserved at trial—will be considered abandoned." *Access Now*, 385 F.3d at 1330 (citation and internal quotation marks omitted).

Here, Lisa's briefs certainly do not "plainly and prominently raise" her Periwinkle Loan Claim. For starters, her opening brief does not "devot[e] a discrete section of [the] argument" to it. In fact, as I have noted, it does not even identify the claim in an issue on appeal or ever expressly mention the Periwinkle Loan Claim in its ECOA arguments. And her reply brief does not address the issue at all.

Nor, contrary to the Majority Opinion's suggestion, does Lisa's mention of the district court's reliance on *Hawkins v. Community Bank of Raymore*, 761 F.3d 937 (8th Cir. 2014), *aff'd by an equally divided Court*, 136 S. Ct. 1072 (2016), justify the Majority Opinion's determination of an issue that Lisa did not raise on appeal.

---

[3] The Federal Rules of Appellate Procedure similarly require an appellant's brief to "contain, under appropriate headings and in the order indicated . . . a statement of the issues presented for review." Fed. R. App. P. 28(a)(5).

38

To be sure, the district court did invoke *Hawkins* to dismiss counterclaims relating to the Periwinkle Loan Claim.  Maj. Op. at 27.  But Lisa's brief leaves no doubt that she raised the district court's reliance on *Hawkins* for only an altogether different and unrelated point:  she cited the district court's mention of *Hawkins* solely to support her argument concerning the Legal Outsource Claim.[4]

In fact, in the very next paragraph following the general reference to *Hawkins* the Majority Opinion cites, *see* Maj. Op. at 27, Lisa characterized *Hawkins* as "grant[ing] lenders an untethered license to require spouses to collateralize and sign for their ***husbands' loans*** with impunity."  Appellants' Br. at 30 (emphasis added). And while Lisa argued that she and Periwinkle "fall squarely within ECOA's protections," Maj. Op. at 28 (quoting Appellants' Br. at 32), she made clear that she meant that the ECOA protected her (through her ownership of Periwinkle) and Periwinkle *as guarantors of the Legal Outsource Loan*:  she said that "Regions required [her through Periwinkle] to sign for and collateralize ***her husband's*** business debts hence violating ECOA prohibitions."  Appellants' Br. at 32 (emphasis added).

There's no doubt that Lisa argued that guarantors have standing under the ECOA, but her brief makes clear that she made this argument in the context of the

---

[4] Lest there be any question about what Lisa argued on appeal, I have included as an appendix to this opinion the statement of issues from Lisa's opening brief, as well as the entirety of her ECOA argument.

Legal Outsource Loan Claim—that is, that under the ECOA, Regions could not require her individually or through her company to guarantee her husband's company Legal Outsource's loan.  But as I have noted, the problem with that argument is Lisa never raised it in the district court.

As for the Periwinkle Loan Claim she did raise in the district court, the most we can say about that is that Lisa's brief on appeal nakedly cites her Counterclaim 11, which in turn, alleged the Periwinkle Loan Claim in the district court.  But significantly, Lisa's brief cites Counterclaim 11 in the context of arguing the Legal Outsource Loan Claim, in an apparent effort to suggest that the Legal Outsource Loan Claim was properly raised in the district court.  (It was not.)

And even if we ignore the context of the citations to Counterclaim 11, (literally) bare citations alone do not preserve an argument on appeal.  We have found abandonment when litigants have done more to preserve their claims, such as "when [at least] passing references appear in the argument section of an opening brief," and when "they are buried within . . . arguments." *Sapuppo*, 739 F.3d at 682. As this Court has recently "remind[ed] the . . . bar[,] . . . *specific* factual and legal argumentation at every stage of . . . proceedings" is "importan[t]" to preserving issues on appeal.  *United States v. Corbett*, 921 F.3d 1032, 1043 (11th Cir. 2019)

(W. Pryor, Newsom, Vratil, JJ.).[5]　So under our unequivocal precedent, Lisa's briefing indisputably abandoned the Periwinkle Loan Claim.

Lisa's counsel likewise did not raise the Periwinkle Loan Claim issue at all during his initial oral argument.　And during his rebuttal, while Lisa's counsel briefly addressed the "ECOA issue," he argued only that Lisa had raised a triable issue of fact that Regions had required Lisa "to provide collateral *for her husband's loan*."　Oral Argument at 24:04, 24:25, *Regions Bank v. Legal Outsource PA, et al.* (No. 17-11736),　http://www.ca11.uscourts.gov/oral-argument-recordings?title=17-11736&field_oar_case_name_value=&field_oral_argument_date_value%5Bvalue%5D%

---

[5] Indeed, this Court has consistently enforced the abandonment rule.　*See*, *e.g.*, *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1259 n.9 (11th Cir. 2019) (en banc); *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1302 n.2 (11th Cir. 2019) (Tjoflat, E. Carnes, W. Pryor, JJ.); *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1306 n.1 (11th Cir. 2018) (W. Pryor, Branch, Anderson, JJ.); *United States v. Wenxia Man*, 891 F.3d 1253, 1275 (11th Cir. 2018) (W. Pryor, J. Pryor, Black, JJ.); *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1345 (11th Cir. 2017) (W. Pryor, Jordan, Baldock, JJ.); *United States v. Stein*, 846 F.3d 1135, 1151 n.15 (11th Cir. 2017) (W. Pryor, J. Pryor, Story, JJ.); *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 797 n.2 (11th Cir. 2016) (W. Pryor, J. Carnes, Siler, JJ.); *Sorrels v. NCL (Bah.) Ltd.*, 796 F.3d 1275, 1283 (11th Cir. 2015) (W. Pryor, Jordan, Jones, JJ.); *In re McFarland*, 790 F.3d 1182, 1191 n.10 (11th Cir. 2015) (Tjoflat, W. Pryor, Baldock, JJ.); *Perez v. U.S. Bureau of Citizenship & Immigration Servs.*, 774 F.3d 960, 964 (11th Cir. 2014) (per curiam) (Marcus, W. Pryor, Fay, JJ.). But puzzlingly, today, the Majority Opinion selectively applies the abandonment rule to correctly decline ruling on whether a corporation can be an "applicant" under the ECOA, since "the obligors briefly mention Periwinkle's counterclaim in their argument about the Equal Credit Opportunity Act, [but] they have failed to argue or cite caselaw in either the district court or on appeal to rebut the conclusion that its status as an entity defeats its claim, as the district court ruled . . ." Maj. Op. at 7–8. Yet the Majority Opinion incorrectly stretches to "resolve" a specific claim Lisa does not even raise at all in her briefs on appeal—whether Lisa may rely on the ECOA to contest Regions's demand that her husband, Charles, and his law firm, Legal Outsource PA, guaranty the loan to Periwinkle.

41

5Byear%5D=&field_oral_argument_date_value%5Bvalue%5D%5Bmonth%5D=

("Oral Argument").

The only time during this appeal that either party raised Lisa's role as a guarantor of the Periwinkle Loan was in Regions's opposition brief. Appellee's Br. at 39–42. According to the Majority Opinion, this makes the argument fair game. Maj. Op. at 30–31. But here's the problem: Lisa never took the bait. She didn't adopt Regions's characterization of her argument. She didn't respond to Regions's argument in her reply brief. Her counsel did not agree with it during oral argument. And by the time Regions's counsel got to oral argument, Regions argued—over no claim to the contrary—that Lisa had abandoned the Periwinkle Loan Claim.[6] So on appeal, no one ever argued in favor of Lisa and Periwinkle's position on the Periwinkle Loan Claim.

To recap, Lisa never argued in her opening brief that she had standing as a guarantor to challenge the loan made to Periwinkle. Regions raised that argument in its opposition brief, but Lisa did not respond to it in her reply brief. Lisa's counsel did not raise the argument during oral argument. Regions's counsel then argued that

---

[6] *See* Oral Argument at 13:48 ("If you look at the counterclaim that was brought before the district court and what has been argued here in the briefs, *it's [a] completely different factual situation*. They haven't even advanced the right argument in our position. . . .") (emphasis added), 18:02 ("[T]hey're arguing that there was discrimination because *when the Legal Outsource loan matured* and Regions Bank said we can't extend the maturity on this because Legal Outsource is defunct, it's not credit-worthy, you need to provide an additional source of repayment collateral—something to that effect—they're saying in the brief, which they never raised in front of Judge Magnuson, that *that* is the ECOA violation.") (emphasis added).

42

Lisa had abandoned this argument.  And Lisa's counsel never disputed this.  It's not on appeal.

Perhaps for this reason, the Majority Opinion introduces the novel suggestion that amici can decide what issues are before us.  Maj. Op. at 31–32.  Amici frequently provide valuable insight to the court by "supplementing the efforts of private counsel and by drawing the court's attention to law that might otherwise escape consideration[.]"  *Shoemaker v. City of Howell*, 795 F.3d 553, 562 (6th Cir. 2015) (quoting 3-28 Moore's Manual—Federal Practice and Procedure § 28.84 (2014)).  We are grateful for their contribution.  But we don't let them select the issues.[7]  *See Cellnet Commc'ns, Inc. v. F.C.C.*, 149 F.3d 429, 443 (6th Cir. 1998) ("To the extent that the amicus raises issues or make[s] arguments that exceed those properly raised by the parties, we may not consider such issues.").

_____

[7] And besides, the Majority Opinion is wrong when it suggests that the amicus briefs support its conclusion that Appellants raised the ECOA standing issue in the context of the Periwinkle Loan claim.  *See* Maj. Op. at 31–32.  On the contrary, the banking associations' amicus brief plainly understood Appellants to have raised the ECOA standing issue as it relates to only the Legal Outsource Loan Claim on appeal.  Their brief describes the issue Appellants raise as follows:  "Appellants incorrectly argue that the Equal Credit Opportunity Act affords 'Lisa Phoenix and Perwinkle [sic] [Partners, LLC]' a claim that Regions [Bank] required them to sign for and collateralize **her husband's business debts**[.]"  Bankers' Br. at 10 (emphasis added) (alterations in original).  Clearly, this pertains to only the Legal Outsource Loan Claim on appeal.  It does not reference the Periwinkle Loan Claim.  To be sure, the Bankers briefed the issue of whether a guarantor has standing, but according to their own words, they did so in the context of the Legal Outsource Loan Claim because that's what they understood Appellants to argue in their brief.  The Bankers obviously did not understand Appellants to raise the guarantor-standing issue as it relates to the Periwinkle Loan Claim.  For good reason:  on appeal, Appellants never argued that issue in the context of the Periwinkle Loan Claim.  As for the other amicus brief, submitted by the Consumer Financial Protection Bureau, it focused on what it disagreed with in the district court's opinion, as opposed to characterizing Appellants' argument on appeal.

Other courts have identified only very limited circumstances warranting a court's decision to overlook abandonment of an argument or issue and decide it, anyway. None applies here.

In *Silber v. United States*, 370 U.S. 717, 717–18 (1962), for example, the Supreme Court explained that when a party fails to raise an issue on appeal, courts "[i]n *exceptional* circumstances, *especially in criminal cases*, . . . .in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are *obvious*, or if they otherwise *seriously affect the fairness, integrity, or public reputation of judicial proceedings*." (emphasis added) (citation and quotation marks omitted). The Majority Opinion has offered no reason why this case presents "exceptional circumstances," and I am aware of no such reason. This is also not a criminal case. Nor, in light of the fact that the Supreme Court recently split 4-4 on the issue the Majority insists on addressing today, *Hawkins*, 136 S. Ct. at 1072, and other circuits are similarly split two to one, can we say the answer to the unraised issue is "obvious." And finally, since the Majority Opinion's answer to the unraised issue results in precisely the same outcome as declaring the issue abandoned—either way, the district court is affirmed—I can see no way that the unraised issue "seriously affect[s]"—or, for that matter, affects at all—"the fairness, integrity, or public reputation of judicial proceedings."

Other Circuits have also identified extremely limited circumstances in which it might be appropriate for an appellate court to address an issue that no party raised. These other Circuits have reasoned that a court may determine an unraised issue where doing so would "enhanc[e] the efficiency of the decisionmaking process and the conservation of scarce judicial resources," and "remand 'would further postpone the ultimate resolution of' the petitioner's underlying claim for relief." *United States v. Holness*, 706 F.3d 579, 592 (4th Cir. 2013) (quoting *LaBruna v. U.S. Marshal*, 665 F.2d 439, 442 (2d Cir. 1981)). Similarly, the Seventh Circuit has concluded it is appropriate to review an unraised issue only when these controlling factors decidedly favor review: the size and complexity of the record, the certainty of the resolution of the issue, and the need for "protracted, costly, and ultimately futile proceedings in the district court," in the absence of addressing the forfeited issue. *United States v. Giovannetti*, 928 F.2d 225, 227 (7th Cir. 1991).

Of course, not one of these circumstances describes this case. The record here is not particularly lengthy or complex; resolution of the issue here, as I have noted, is not cut and dry; and declining to reach the issue would not "result in protracted, costly, and ultimately futile proceedings in the district court." *Id.* Whether we address the unraised issue or not, the result is the same: affirmance of the district court's order granting summary judgment to Regions. In fact, ironically, deciding the unraised issue here makes today's opinion unnecessarily lengthy and complex.

45

So it should go without saying that this case does not present an appropriate vehicle to justify a wholly unnecessary journey into the deeply debated question of whether "guarantors" can be "applicants," when the claim as resolved by the Majority Opinion should be dismissed, regardless, since it was clearly abandoned.

Apparently recognizing the inadvisability of determining an issue no Appellant invoked and failing to convince even itself that Appellants have raised the Periwinkle Loan Claim on appeal, the Majority Opinion tries a different tack and insists that Appellants' Legal Outsource Loan Claim arguments "logically . . . can relate only" to Counterclaims 11 or 12 (Lisa's individual claim as a guarantor of the Periwinkle loan). Maj. Op. at 28. At the risk of repetition but for the avoidance of doubt, I offer a simpler explanation: on appeal, Lisa, for the first time in this case, has raised a new claim about Regions's attempt to make her (through Periwinkle) guaranty the Legal Outsource Loan. She did not plead the claim in her Counterclaims—including Counterclaims 11 or 12—and she did not otherwise sufficiently develop it in the district court.

Perhaps it was "nonsensical" for Lisa to raise the Legal Outsource Loan Claim at this point, Maj. Op. at 33, but that was her prerogative, not ours. Our task here is to "decide . . . [the] questions presented by the parties." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (citation and quotation marks omitted). Our responsibility to construe briefs "liberally" does not grant us permission to recast what was

46

appealed simply because we want to reach an issue that the parties left behind. *See Nat'l Aeronautics and Space Admin. v. Nelson*, 562 U.S. 134, 147 n.10 (2011) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.") (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (opinion for the court by Scalia, J.)); *Greenlaw*, 554 U.S. at 243 ("In our adversary system . . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

As for the Legal Outsource Loan Claim, this is hardly the first time a litigant has tried to raise a "wholly novel claim" for the first time on appeal. Maj. Op. at 33. When that happens, it has long been this Court's practice to refuse to consider the issue. *See In re Holywell Corp.*, 874 F.2d 780, 782 (11th Cir. 1989) (refusing to consider claim that was not presented to the district court); *Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530, 532 (11th Cir. 1983) (refusing to consider affirmative defense raised for the first time on appeal); *see also Access Now*, 385 F.3d at 1331 ("[W]e review claims of judicial error in the trial courts. If we were to regularly address questions—particularly fact-bound issues—that districts court never had a chance to examine, we would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court.").

47

Because Lisa raises the Legal Outsource Loan Claim for the first time on appeal, the better course would be to forgo considering it at this late hour. *Access Now*, 385 F.3d at 1330–35. We can, however, make exceptions to our general prohibition against considering new claims for the first time on appeal if one of our limited exceptions to the rule applies.[8] *See id.* at 1332. The only exception that could even possibly pertain here allows us to evaluate a new issue for the first time on appeal "if that issue presents significant questions of general impact or of great public concern." *Id.* at 1332.

Perhaps we could rely on that exception to consider whether guarantors are considered "applicants" under the ECOA in the context of Lisa's contentions arising out of the Legal Outsource Loan Claim. But if we are going to do that, we should say so and explain why the exception applies.

Unfortunately, though, that's not what the Majority Opinion does. Instead, inexplicably, it simply considers whether guarantors have standing under the ECOA, in the context of "resolving" the Periwinkle Loan Claim, ignoring Lisa's abandonment of that claim on appeal and Regions's argument that Lisa has forsaken that claim for good by not appealing it. Because Lisa opted not to present the

---

[8] We have explained that we may consider an issue raised for the first time on appeal (1) "if it involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice"; (2) if "the appellant raises an objection to an order which he had no opportunity to raise at the district court level"; (3) if "the interest of substantial justice is at stake"; (4) if "the proper resolution is beyond any doubt"; or (5) "if that issue presents significant questions of general impact or of great public concern." *Access Now*, 385 F.3d at 1332.

48

Periwinkle Loan Claim to us on appeal, it should be clear that that claim leaves nothing to be "resolved."

## II.

Nevertheless, because the Majority Opinion purports to improperly narrow the ECOA, I must explain why its reasoning is wrong. I begin by setting forth the framework we apply to the question the Majority Opinion has chosen to address: whether guarantors are included within the meaning of "applicants" under the ECOA.

Since we are construing the meaning of a statute, we must start with the text. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). We consider whether the text plainly and unambiguously answers the particular question at issue. *Id.* In assessing the text, we keep in mind that "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). To determine the proper meaning, we evaluate "the whole statutory text, considering the purpose and context of the statute, and consult[] any precedents or authorities that inform the analysis." *Id.*; *see also Crandon v. United States*, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."). And when a statute is remedial in nature, we apply the well-established rule that requires us to construe the text "broadly to effectuate its

49

purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *Stewart v. Kahn*, 78 U.S. 493, 504 (1870); *SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017) (observing that remedial legislation "is entitled to a broad construction") (citations omitted).  If, after we apply these rules, the text is unambiguous, yielding but a single possible answer to the question at issue, our analysis ends.  For we "must give effect to the unambiguously expressed intent of Congress."  *Cadet v. Bulger*, 377 F.3d 1173, 1185 (11th Cir. 2004) (citation and quotation marks omitted).

But if the text does not unambiguously answer the precise question we are examining, we must conduct an analysis under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron*, we determine whether the agency charged with filling in the ECOA's gaps—originally the Federal Reserve Board but beginning in 2010, the Consumer Financial Protection Bureau[9]—has established a permissible answer to our question.  The agency's interpretation is permissible if it is "reasonable."  *Id.* at 844.  And we must defer to an agency's reasonable construction of a statute for which that agency enjoys rulemaking authority.  *Id.*  If, on the other hand, the agency's interpretation of the statute as it

---

[9] In 2010, Congress transferred the Federal Reserve's rulemaking authority to the Consumer Financial Protection Bureau. 15 U.S.C. 1691b(a).  The Bureau has since repromulgated Regulation B without making material changes. 12 C.F.R. Pt. 1002 & Supp. I; *see* Equal Credit Opportunity (Regulation B), 76 Fed. Reg. 79,442 (Dec. 21, 2011).  Because Regulation B has remained materially the same since its original promulgation by the Federal Reserve, to avoid confusion, for the remainder of this opinion, I refer solely to the Federal Reserve as the administering body.

concerns the precise issue in controversy is "arbitrary, capricious, or manifestly contrary to the statute," the agency's answer is entitled to no weight. *Id.*

With this framework in mind, I consider whether a guarantor qualifies as an "applicant" under the ECOA. I divide my discussion into three parts. In accordance with the Supreme Court's guidance for construing statutory text, *see Dolan*, 546 U.S. at 486, and because the ECOA has "broad remedial goals," *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1211 n.6 (6th Cir. 1997), Section A reviews the background, purpose, and broader context of the ECOA as a whole. *Cf. Zuni Pub. Sch. Dist. No.89 v. Dep't of Educ.*, 550 U.S. 81, 89–90 (2007) (departing from usual order of analysis for purposes of exposition). Section B examines the statutory text. And Section C considers the Federal Reserve's approach to answering the question of whether a guarantor qualifies as an "applicant" under the ECOA.

## A.

Women were integral to the United States's World War II triumph through, among other ways, their efforts in the workforce.[10] Buoyed by their experiences during the War, women helped detonate America's historic Post-War economic boom by flocking to workplaces in unprecedented droves.[11]

---

[10] Jone Johnson Lewis, *Women and World War II:  Women at Work*, ThoughtCo, Mar. 5, 2019, *available at* https://www.thoughtco.com/world-war-ii-women-at-work-3530690 (last visited Aug. 27, 2019).

[11] Howard N. Fullerton, Jr., *Labor Force Participation: 75 Years of Change, 1950-98 and 1998-2025*, Monthly Lab. Rev. 3 (Dec. 1999), *available at* http://www.bls.gov/mlr/1999/12/art1full.pdf (last visited Aug. 27, 2019).

But significant impediments to women's economic parity nonetheless persisted. A particularly important obstacle involved credit availability: creditors would not lend to women so they could start their own businesses or buy their own homes because creditors refused to consider women's applications on par with men's. And the increasing necessity of credit to achieve economic security made this impediment particularly restrictive.[12]

That women faced rampant discrimination in accessing credit was no secret. In fact, in the early 1970s, the then-President of the American Bankers Association openly admitted that banks "do in fact discriminate against women when it comes to granting credit."[13] And in 1972, the National Commission on Consumer Finance found five systemic patterns of gender-based credit discrimination: (1) single women had more trouble obtaining credit than single men; (2) creditors required women to reapply for credit upon marriage, usually in the husband's name; (3) creditors declined to extend credit to a married woman in her own name; (4) creditors often refused to count the wife's income when the couple applied for credit; and (5) women who divorced or widowed had trouble reestablishing credit since the

---

[12] Dubravka Ritter, *Do We Still Need the Equal Credit Opportunity Act?*, Fed. Res. Bank of Phila. (Sept. 2012), *available at* https://www.philadelphiafed.org/-/media/consumer-finance-institute/payment-cards-center/publications/discussion-papers/2012/d-2012-equal-credit-opportunity-act.pdf?la=en (last visited Aug. 27, 2019).

[13] Susan Smith Blakely, *Credit Opportunity for Women: The ECOA and Its Effects*, 1981 Wis. L. Rev. 655, 657 (1981) (citation omitted).

accounts were in the husband's name.  Nat'l Comm. On Consumer Fin., *Consumer Credit in the United States*, 152–53 (1972).

So before marriage, regardless of a woman's wealth accumulation, creditors viewed women as poor credits risks because they considered them "inherently unstable and incapable of handling [their] own affairs . . . and likely to change [their] marital status."  Gail R. Reizenstein, *A Fresh Look at the Equal Credit Opportunity Act*, 14 Akron L. Rev. 215, 226 (1980) (citation omitted) ("Fresh Look").  Many creditors even demanded that women disclose the type of birth control they relied upon.  *Credit Equality Comes to Women: An Analysis of the Equal Credit Opportunity Act*, 13 San Diego L. Rev. 960, 965 (1976).  Some creditors took it yet a step further by making women choose between babies and credit by conditioning a woman's credit approval on her "swear . . . that [she] would not endanger [her] ability to repay [her] debt[] by having children."  *Id.* (citations omitted).

Getting married usually didn't improve women's lots in credit markets because lenders often folded whatever credit women had before marriage into their husbands' credit.  For instance, after winning multiple Wimbledon championships and supporting her household with those earnings, Billie Jean King could not get a credit card in her own name; rather, she had to apply in the name of her husband, who at that time, was an unemployed law student.  Gail Collins, *When Everything Changed: The Amazing Journey of American Women from 1960 to the Present*, 182

(Little, Brown & Co. ed., 2014).  And bankers told the mayor of Davenport, Iowa, that they would give her a credit card only if her husband would sign for it.  *Id.*

This state of affairs created a paradox for women:  they couldn't have their own credit during marriage, and if they divorced or became widowed, lenders would deny their applications because they lacked established credit of their own. *Economic Problems of Women: Hearings Before the Joint Economic Committee*, 93d Cong. 152, 1st Sess. (1973) ("The irony of these credit practices is that when a woman is divorced, separated, or widowed she often is denied credit by these same credit companies on the grounds that she has no established credit record.") (Statement of U.S. Rep. Griffiths, Member, Joint Econ. Comm.) ("*Economic Problems*").  And many women started post-marriage life even worse off than having no credit because lenders insisted on tying women's financial fortunes to those of their ex-husbands, and their ex-husbands' delinquent accounts often detracted from the women's credit scores even after the marriage ended.  *See Fresh Look* at 225.

This atmosphere evolved out of the wrong[14] but "widely-held" presumptions that "probability of pregnancy, the subsequent termination of employment upon

---

[14] Despite higher levels of unemployment than men at the time, women were, in fact, better credit risks than men, studies showed.  A study commissioned in 1964 examined the possible correlation between consumer credit risk and sex.  It found that out of 8,795 credit accounts established for single men, 176 defaulted (2%); while among 4,337 accounts established for single women, only 33 defaulted (0.75%).  *See* Sharon Thornton, *The Not-So-Equal Credit Opportunity Act*, 5 Orange Cty. B.J. 363, 366 (1978).

54

childbirth, and the general instability and inability of women to control their personal affairs (especially single and divorced women)" made women bad bets. *Fresh Look* at 216 (citation omitted).

Eventually, Congress began to recognize the inequities of tethering women's economic prospects to their husbands and the risks this discrimination posed to the new economy. So in the early 1970s, Congress addressed the problem.

Testimony before Congress established that at that time, to obtain credit, women needed a higher salary and more stable employment than men. *See* Senate Comm. On Banking, Housing & Urban Affairs, S. Rep. No. 93–278, 93rd Cong., 1st Sess. 16–17 (1973) ("Senate Rpt."); *see also Economic Problems* at 197; *Credit Discrimination: Hearings Before the Subcomm. on Consumer Affairs of the House Comm. on Banking and Currency on H.R. 14856 and H.R. 14908*, 93rd Cong., 2d Sess. 315, 636 (1974).[15] Creditors operated under the assumption that women were economically dependent upon their husbands, even if in reality, the wife's earnings outpaced her husband's. *See* Senate Rpt. at 17–18. Creditors also usually altered a wife's credit rating to match her husband's and frequently refused to give married women separate accounts. *See id.* at 17.

---

[15] During the hearings, one person relayed that an employee of a credit institution had stated that it was "un-American to count a woman's income and that the only way a woman's income could be counted would be if she were to have a hysterectomy." *Economic Problems* at 192 (quotation marks omitted).

The congressional hearings culminated in the Senate Subcommittee's report that found thirteen different "widespread" ways creditors discriminated on the basis of sex and marital status:

(1)     Women were held to different standards than men in obtaining credit;

(2)     Creditors generally required a woman upon marriage to reapply for credit;

(3)     Creditors often refused to extend credit to a married woman in her own name;

(4)     Creditors were usually unwilling to consider the wife's income when a married couple applied for credit;

(5)     Women who had separated had a particularly difficult time, since the accounts may still have been in the husband's name;

(6)     Creditors arbitrarily refused to consider alimony and child support as a valid source of income;

(7)     Creditors applied stricter standards to married applicants where the wife was the high earner;

(8)     Creditors used information about women's birth-control practices in evaluating credit applications;

(9)     Creditors used information concerning the creditworthiness of a spouse where an otherwise-creditworthy married person applied for credit;

(10)    Creditors refused to issue separate accounts to married persons;

(11)    Creditors considered women dependent upon their husbands even if the women were employed;

56

(12)  Creditors used credit-scoring systems that applied different values depending on sex or marital status; and

(13)  Creditors altered women's credit ratings to match their husbands' credit ratings.

Senate Rpt. at 16–17.

Against this background and in light of these findings, Congress enacted the ECOA in 1974.  In doing so, Congress concluded sex and marital status "are, and must be, irrelevant to a credit judgment."  Senate Rep. (Banking Hous. and Urban Affairs Comm.), S. Rep. No. 94 – 589, 94th Cong., 2d Sess. 3 (1976), reprinted in 1976 U.S.C.C.A.N. 403, 405; *see also* 15 U.S.C. § 1691 (articulating the ECOA's prohibition of credit discrimination based on gender or marital status).

So it is not surprising that the ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction [] on the basis of . . . sex or marital status. . . ." 15 U.S.C. § 1691(a)(1).[16]  Indeed, the ECOA represents Congress's resolve to "eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit," *Anderson v. United Fin. Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982), and "to prevent loans from being conditioned automatically on the

---

[16] In 1976, Congress extended the ECOA to bar creditors from discriminating on the basis of race, color, religion and national origin.  *See* 15 U.S.C. § 1691(a); Ritter, *supra*, at 2–3.

securing of the signature of the non-borrowing spouse," *Mayes v. Chrysler Credit Corp.*, 167 F.3d 675, 676 (1st Cir. 1999).

Against the crazy quilt of discriminatory practices creditors were using at that time, Congress declined to spell out each methodology or action that amounts to impermissible discrimination. Instead, Congress rested on the ECOA's broad language and "entrust[ed] its construction to an agency with the necessary experience and resources to monitor its operation." *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 365 (1973). Specifically, Congress delegated to the Federal Reserve the task of adopting "classifications, differentiation, or other provision[s]," that were, in the Federal Reserve's judgment, "necessary or proper to effectuate the [ECOA's] purposes. . . ." 15 U.S.C. § 1691b(a).

Shortly after Congress enacted the ECOA, the Federal Reserve took the baton from Congress and promulgated Regulation B to implement Congress's directive to combat sex- and marital-status-based credit discrimination. 12 C.F.R. § 202.1(b) (stating that the purpose of Regulation B is "to promote the availability of credit to all creditworthy applicants without regard to . . . sex [or] marital status. . . ."). Included within Regulation B is the Spousal Guaranty Rule, which generally prohibits creditors from treating married people differently by requiring spouses to assume liability for each other's debt obligations. 12 C.F.R. 202.7(d); Equal Credit Opportunity Final Rulemaking, 40 Fed. Reg. 49,308–09 (Oct. 22, 1975). Therefore,

58

ever since 1977, Regulation B has prohibited creditors from obligating an individual to guaranty her spouse's debts.

Some courts, though, interpreted Regulation B to mean that when a creditor violated the Spousal Guaranty Rule, the only "applicant" who suffered discrimination was the primary borrower, not the spouse who guaranteed the loan. *See, e.g., Morse v. Mut. Fed. Sav. & Loan Ass'n of Whitman*, 536 F. Supp. 1271, 1278 (D. Mass. 1982). The Federal Reserve recognized that this restrictive reading thwarted one of the purposes of the ECOA—ensuring access to an independent credit profile by detangling spouses' credit—since the guarantor spouse could be saddled with her husband's bad debt with no recourse under the ECOA.

So in 1985, the Federal Reserve expressly construed the ECOA's definition of "applicant"—"any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit," 15 U.S.C. § 1691a(b)—to include "guarantors, sureties, endorsers, and similar parties" "[f]or purposes of" the Spousal Guaranty Rule. 12 C.F.R. 202.2(e). In doing so, the Federal Reserve emphasized that it was not imposing any new obligations, since in accordance with the ECOA, Regulation B had long prohibited creditors from requiring a guaranty from a borrower's spouse. Rather, the Federal Reserve explained, it was just recognizing that the guarantor spouse also has

59

standing when the creditor straps the spouses' credit fortunes together. Equal Credit Opportunity; Revision of Regulation B; Official Staff Commentary, 50 Fed. Reg. 48,018 (Nov. 20, 1985).[17]

**B.**

We begin our analysis of whether the ECOA includes guarantors within the definition of "applicants" by evaluating the statutory text. The ECOA makes it "unlawful for *any* creditor to discriminate against *any* applicant, with respect to *any* aspect of a credit transaction [] on the basis of . . . marital status. . . ." 15 U.S.C. § 1691(a)(1) (emphasis added). In turn, the ECOA defines "applicant" as "*any* person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b) (emphasis added).

Two aspects of this text immediately stand out.

First, Congress employed the word "any" four times in these two sentences. The Supreme Court has explained that "the word 'any' has an expansive meaning." *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citation omitted). The Majority

---

[17] The Federal Reserve made Regulation B firm but flexible. If a party is needed to support the loan request because the potential debtor husband's credit is insufficient, the wife can guaranty the loan. Regulation B just bars lenders from "requir[ing] that the spouse be the additional party." 12 C.F.R. 202.7(d)(5).

Opinion is correct that the word "any" does not change the definition of the word it modifies. Maj. Op. at 18–19. But when that word appears repeatedly over just a couple of sentences—here, four times in two sentences—"it begins to seem that Congress meant the statute to have expansive reach." *See United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 7 (2008).[18]

This would be true for any statutory provision that abundantly uses the word "any," but it is especially so when dealing with remedial legislation. Where Congress uses the term "any" with a "lack of [accompanying] restrictive language," the Supreme Court has instructed us to "refuse[] to engraft artificial limitations" that curb the "expansive remedial purpose[s]" connoted by such language. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982); *see id.* (broadly construing "[*a*]*ny* person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws"). So, for example, the text's prohibition against marital-status discrimination "with respect to *any* aspect of a credit transaction," 15 U.S.C. § 1691(a)(1) (emphasis added), purports to preclude marital-status discrimination in all aspects of credit transactions, including against guarantors.

---

[18] *See also Dennis v. Higgins*, 498 U.S. 439, 443 (1991) ("A broad construction of § 1983 is compelled by the statutory language, which speaks of deprivations of '*any* rights, privileges, or immunities secured by the Constitution and laws.' Accordingly, we have repeatedly held that the coverage of [§ 1983] must be broadly construed.") (citations and quotation marks omitted).

61

Nevertheless, and second, the statutory provisions do not expressly answer the key question at issue here:  must the applicant request credit for herself or may she request it for somebody else?   As the Sixth Circuit has noted, "the applicant and the debtor are not always the same person."  *RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 385 (6th Cir. 2014).  And the Majority Opinion's listed common dictionary definitions of "apply" do not limit applicants to only the proposed debtor, because they do not foreclose the scenario where an applicant makes a request for credit on someone else's behalf.

Similarly, both the Sixth and Eighth Circuits, in construing the text at issue, have relied on common dictionary definitions of "apply" as meaning "to make an appeal or request especially formally and often in writing and ***usually for something of benefit to oneself***."  *Hawkins*, 761 F.3d at 941 (quoting *Webster's Third New Int'l Dictionary* at 105 (2002) (quotation marks and alterations omitted) (emphasis added); *RL BB Acquisition*, 754 F.3d at 385 (quoting *Webster's Third New Int'l Dictionary* at 105 (1993) (cleaned up)); *see also Webster's Third New Int'l Dictionary* at 105 (1961) (same definition, cleaned up).  Obviously, if something is "***usually*** for something of benefit to oneself," it must ***sometimes*** be for something of benefit to another.

So we must consider whether a guarantor may ever reasonably and naturally be viewed as requesting "something of benefit" to another—that is, credit for the

benefit of the proposed debtor.  As it turns out, under the plain meaning of "guarantor," she may.

As Corbin on Contracts explains, "In most cases of guaranty contracts, the offer comes from the guarantor requesting the giving of credit to a principal debtor. . . ."  *See* Timothy Murray, Corbin on Contracts § 3.14, at 467 (rev. ed. 2018).[19]  In fact, a guaranty is typically enforceable only because, in exchange for the creditor's promise to extend credit to the debtor, the guarantor promises to repay the loan if the primary debtor defaults.  *See* Restatement (Second) of Contracts § 71(2) (1981).  Thus, guaranty contracts would be unenforceable absent the exchange of consideration by the guarantor—a promise to repay—and the creditor—the fulfillment of the guarantor's "application" that it lends to the debtor.  *See* Restatement (Third) of Suretyship and Guaranty § 9, cmt. a (1996); Joseph M. Perillo, Corbin on Corbin § 9.4, at 252–253 (rev. ed. 1996); *see also United States v. Burgreen*, 591 F.2d 291, 294 (5th Cir. 1979) (finding that guaranty was supported by consideration through the loan to the primary borrower).

The Majority Opinion charges that this definition of "apply" falls outside the word's natural meaning.  Maj. Op. at 20.  But there are three problems with the Majority Opinion's position.

---

[19] Additionally, other banking regulations provide that guarantors request and receive extensions of credit.  *See*, *e.g.*, 12 C.F.R. 215.3(a)(4).

First, in support of its argument, the Majority Opinion inexplicably invites readers to consider an incongruous hypothetical, arguing that parents who seek to bribe their daughter's way into college by offering to "make a large gift if their daughter is admitted" are not "applicants." Maj. Op. at 13. I agree. But nor are they analogous to guarantors. Unlike the parents in the Majority Opinion's hypothetical, who can obtain admission for their daughter only by paying a bribe to the college, a guarantor does not bribe or otherwise pay the creditor for credit to be extended to another. And if the eventual debtor pays back the credit, the guarantor will never pay anything. So the Majority Opinion's efforts to explain in tangible terms why a guarantor cannot fall within the meaning of "applicant" fail.

Second, none of the many definitions of the word "apply" that the Majority Opinion cites *excludes* the interpretation that the application was for someone else. Maj. Op. at 10–11. And that is significant to our analysis. In *Smith v. United States*, 508 U.S. 223, 225 (1993), for example, the Supreme Court had to determine whether the exchange of a gun for narcotics amounted to the "use" of a firearm "during and in relation to . . . [a] drug trafficking crime," within the meaning of 18 U.S.C. § 924(c)(1). The Court rejected the petitioner's request to apply only the limited and most common meaning of the phrase. *Id.* at 229. Rather, the Court determined that trading a firearm for drugs also qualified as "use" of the firearm under the statute, explaining, "It is one thing to say that the ordinary meaning of 'uses a firearm'

64

*includes* using a firearm as a weapon, since that is the intended purpose of a firearm and the example of 'use' that most immediately comes to mind. But it is quite another to conclude that, as a result, the phrase also *excludes* any other use." *Id.*

Applying *Smith*, we must conclude that the availability of a frequently used definition of "applicant"—one who seeks credit for herself—does not necessarily negate a less-common definition—one who seeks credit for others. That is so because the definitions of "applicant" do not exclude use of the word to refer to guarantors.

And third, the ECOA is a remedial statute that we must construe "broad[ly]" to effectuate its remedial goals. *Barney*, 110 F.3d at 1211 n.6; *see also Levin*, 849 F.3d at 1001 (observing that remedial legislation "is entitled to a broad construction"); *Morante-Navarro v. T&Y Pine Straw, Inc.*, 350 F.3d 1163, 1166 (11th Cir. 2003) (construing the remedial Migrant and Seasonal Agricultural Workers Protection Act "broadly to effect its . . . purpose"). Our task cannot begin and end with a definitional popularity contest. If it did, there would be no way to construe remedial legislation "broadly" to effectuate its purpose, because all words in all statutes would be read as conveying only a single potential meaning.

Notably, the Majority Opinion makes no attempt whatsoever to reconcile the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes," *Tcherepnin*, 389 U.S. at 336, or the

65

caveat that "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities," *Dolan*, 546 U.S. at 486, with the Majority Opinion's the-words-can-have-only-a-single-meaning mantra.[20]   Of course, if either or both of these doctrines apply, the Majority Opinion cannot be right.

So instead of responding substantively, the Majority Opinion asserts the Supreme Court has "rejected applying" the remedial-purpose doctrine.  Maj. Op. at 21.  And it has no answer at all to the Supreme Court's instruction in *Dolan*.

But while the Majority Opinion pulls colorful language from context to suggest that the Supreme Court has determined that the remedial-purpose doctrine is no longer good law, there's a problem with this response:  the Supreme Court has not rejected the doctrine.  Rather, the Court concluded the doctrine was simply inapplicable in the cases the Majority Opinion cites.

For example, there were multiple reasons why the doctrine would not apply to the Comprehensive Environmental Response, Compensation, and Liability Act, the statute at issue in *CTS Corp. v. Waldburger*, 573 U.S. 1 (2014):  (1) the Court

---

[20] As Judge William Pryor explained last year, "the text must be construed as a whole. . . . Strict construction sequesters the words of a text from their context. That is one of the reasons why strict construction is foolish." *Pictet Overseas Inc. v. Helvetia Trust*, 905 F.3d 1183, 1190 (11th Cir. 2018) (William Pryor, J., concurring) (cleaned up); *see also Deal v. United States*, 508 U.S. 129, 132 (1993) *superseded by statute as stated in United States v. Davis*, 139 S. Ct. 2319, 2324 n.1 (2019) (it is a "fundamental principle of statutory construction (and indeed, of language itself), that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").  So we ought not to pluck words out of their context and define them narrowly just because a dictionary indicates that the narrower meaning is the more common one.

held that the statute "d[id] not provide a complete remedial framework," and so it was not necessarily a remedial statute, *see id.* at 18; (2) even if it was a remedial statute, the statute's legislative history supported a construction of the statutory text at odds with the remedial purpose, *see id.* at 14–17; and (3) the statute, which would trump state law if the Court adopted the respondents' argument, was subject to a competing presumption against preemption, *see id.* at 12.

Likewise, the respondents in *Inyo County v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701 (2003), argued that the Bishop Paiute Tribe should be considered a "person" under 42 U.S.C. § 1983, a construction—according to respondents—that would be consistent with the law's remedial purpose. *See Paiute-Shoshone Indians*, 538 U.S. at 710. The Court rejected this bid, holding that "Section 1983 was designed to secure private rights against government encroachment, not to advance a sovereign's prerogative to withhold evidence relevant to a criminal investigation." *See id.* at 711–12 (citation omitted). So rather than rejecting the doctrine, the Court disagreed that the statute was meant to remedy the harms that the respondents addressed.

*Norfolk Southern Railway Co. v. Sorrell*, 549 U.S. 158 (2007), is similarly uninstructive here. *Norfolk* involved the Federal Employers' Liability Act ("FELA"), which makes railroads liable to their employees for injuries "resulting in whole or in part from the negligence" of the railroad, 45 U.S.C. § 51. 549 U.S. at

67

160.  In that case, the Court considered whether the statute permitted different standards of causation for railroad and employee contributory negligence.  *Id.*  Although the Court recognized that FELA was "enacted to benefit railroad employees" and that a more lenient standard of causation for employee contributory negligence would favor employees, it held that FELA required application of a single negligence standard, stating that FELA's "remedial purpose [does not] require[] us to interpret every uncertainty in the Act in favor of employees."  *Id* at 171.  But what's important for this case is that the Court decided that the "system of comparative fault" would not "work" if "the basis of comparison [meaning the standard for contributory negligence] [were not] the same."  *Id.* at 170, 171 (citations omitted).  In other words, the Court left open the possibility that the remedial-purpose doctrine would apply in cases where the object of interpretation makes the difference between accomplishing the statute's central purposes at all and not.

This is just such a case.  First, unlike the situation with FELA in *Norfolk*, construing "applicant" to include guarantors under § 1691(a)(1) does not prevent the ECOA's mechanisms from working.  And unlike whether the contributory negligence standard is the same for employees and employers under the FELA—a question that impacts only the amount of the recovery but not entitlement to recovery—whether "applicant" encompasses guarantors under § 1691(a)(1) does not involve just some random "uncertainty in the Act," *Norfolk*, 549 U.S. at 171.  Rather,

68

the answer to that question determines whether the ECOA will effect one of its central purposes at all—that is, whether the ECOA will allow spouses to disentangle their credit, or whether it will permit lenders to require such entanglement.

The Majority Opinion's reliance on *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232 (2004), fares no better. In that case, the Supreme Court concluded that the statutory language of the Truth in Lending Act was ambiguous on the question at issue there, so it noted that the agency's regulation answering the question was "binding" unless, among other things, "manifestly contrary to the statute." *Id.* at 242 (citation omitted). The Court then concluded that the regulation was "in no way manifestly contrary" to the statute. *Id.*

As was the case with the statute in *Household Credit*, here, the ECOA is ambiguous on the precise question at issue. And when we turn to the agency's interpretation—Regulation B—as in *Household Credit*, that regulation is not "manifestly contrary to the statute." *Id.* Rather, as in *Household Credit*, it furthers one of the "primary goals" of the statute, *see id.* at 243, as I have explained.

Finally, turning to *Director, Office of Workers' Compensation Programs, Department of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995), which the Majority Opinion suggests "ridiculed" the remedial-purpose doctrine and rendered it no longer good law, Maj. Op. at 21 (citing *Newport News*, 514 U.S. at 135), that's not an accurate description of that case. Rather, the Court

69

ridiculed the petitioner's attempt to rely on the doctrine in that case, when the Court was not even analyzing a remedial statute.  In fact, the Court discussed—at some length—that the statute's "goal" was not clear.  *See id.* at 131.  Not only did the Court not invalidate the remedial-purpose doctrine, the Court recognized that the principle of construing any statute broadly to achieve its purposes could be invoked "in case of ambiguity," *id.* at 135, which I submit is the case here.  And finally, the Court in *Newport News* went on to construe the statute at issue "as liberally as can be."  *Id.* at 136.

But you don't have to take it from me; you can take it from the Court itself. Seven years after issuing *Newport News*, the Supreme Court unanimously applied the remedial-purpose doctrine in *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) ("[W]e have explained that [Section 10(b) of the Securities Exchange Act] should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.") (citation and internal quotation marks omitted).

Instead of addressing the substance of this argument on the remedial-purpose doctrine and *Dolan*'s instruction that "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities," 546 U.S. at 486, the Majority Opinion accuses this dissent of engaging in "hornbook abuse of the whole-text canon" and mischaracterizes my argument as "since the overall purpose of the statute

is to achieve *x*, any interpretation of the text that limits the achieving of *x* must be disfavored." Maj. Op. at 20.

But it's not that the Majority Opinion's interpretation of "applicant" "limits the achieving" of the ECOA's purpose of disentangling spouses' financial fortunes, *see* Senate Rpt. at 16–17;[21] it's that it is antithetical to that reason for the ECOA.

The guarantor spouse often suffers a unique economic injury that the primary debtor spouse does not. Say the creditor refuses to extend the loan unless the wife guarantees it, so the wife agrees to do so. But the husband—the direct debtor—may have no complaints, since he received the loan he was after. And even if he did, he may well not have economic damages to assert in a lawsuit. *See, e.g., Mayes*, 167 F.3d at 678 ("[The husband] has no claim for damages or injunctive relief under ECOA for harm done to his wife. If anyone was injured by requiring [the wife] to sign the guarantee, it was she and not [the husband], who after all received the loan he had sought."). Without the potential for redress, he would lack standing.

By contrast, the wife who guaranteed the loan may have a separate injury stemming from the fact that her credit score is likely lower because she agreed to be secondarily liable for the loan. *See* Mechel Glass, Equifax, *Should I Co-Sign On a Loan for a Family Member?*, *available* https://blog.equifax.com/tag/credit-

---

[21] *See also Mayes*, 167 F.3d at 676 (Congress also set out "to prevent loans from being conditioned automatically on the securing of the signature of the non-borrowing spouse.").

71

score/page/4/ (last visited Aug. 27, 2019).  So she may have suffered an injury if she sought credit and was unable to obtain it, or if any credit she did receive either was more limited or bore a higher interest rate than it would have had she not been required to guaranty her husband's loan.  Yet construing "applicants" to exclude guarantors would mean nobody in this scenario would have standing to pursue the creditor's flagrant violation of the ECOA.

And worse yet, allowing lenders to, with impunity, require wives to guaranty their husbands' debts actually creates the same financial intertwinement problems that arose when lenders demanded that women like Billie Jean King obtain their husbands' guaranties before lenders would extend credit to them.  In both cases, the wives' credit is forever tied to the husbands' credit fortunes.

As a result, guaranteeing the husband's loan can "negatively impact [the wife's] credit report and creditworthiness," since guaranteeing a loan shows up on credit reports immediately.  Glass, *supra*, at 26.   And if the husband "miss[es] payments or default[s] on the loan, [the wife's] credit reports will show the delinquencies," ruining her credit history and ability to secure future credit.  TransUnion, *The Benefits & Issues of Co-Signing a Loan*, *available at* http://www.transunion.com/personal-credit/credit-issues-bad-credit/cosigning-a-loan.page (last visited Aug. 27, 2019).

So far from "'open[ing] vistas of liability' that Congress did not envision," Maj. Op. at 24 (quoting *Moran Foods, Inc. v. Mid-Atl. Market Dev. Co., LLC*, 476 F.3d 436, 441 (7th Cir. 2007)), construing "applicants" to include guarantors actually effectuates Congress's goal of disentangling spouses' credit. In contrast, the interpretation the Majority Opinion and the Eighth Circuit in *Hawkins* offer creates the very entanglement of spouses' credit Congress sought to eradicate. That Congress would have prohibited one form of enforced credit entanglement and unworthiness only to allow another to fully replace it makes about as much sense as ice-hockey cleats. *See W. Air Lines, Inc. v. Bd. of Equalization*, 480 U.S. 123, 133 (1987) ("[I]llogical results . . . argue strongly against the conclusion that Congress intended" a particular statutory construction).

The Majority Opinion's reliance on Judge Colloton's *Hawkins* concurrence—where Judge Colloton argued that the word "application" should have only one meaning throughout the ECOA—is similarly misplaced. Maj. Op. at 14–16. I understand Judge Colloton's concern. After all, we "ordinarily assume[] that identical words used in different parts of the same act are intended to have the same meaning." *Utility Air Reg. Grp. v. E.P.A.*, 573 U.S. 302, 319-20 (2014) (citations omitted). But that assumption is not absolute. It "readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different

intent." *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932); *see also Yates v. United States*, 135 S. Ct. 1074, 1082 (2015) ("In law as in life . . . the same words, placed in different contexts, sometimes mean different things."). This is one of those times, or else the ECOA ensures the existence of the very problem it seeks to eliminate.

Even assuming some parts of the ECOA suggest—or even require—a narrow interpretation of the word "applicant," that does not mean that the term as used in 15 U.S.C. § 1691(a)(1) must be similarly construed, since "a characterization fitting in certain contexts may be unsuitable in others." *See NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 262 (1995). For instance, to make his point, Judge Colloton primarily invokes 15 U.S.C. § 1691(d), titled, "Reason for adverse action; procedure applicable; 'adverse action' defined." That subsection articulates what happens when a lender denies or revokes credit to a debtor. It therefore makes sense that it applies to the person who would have received or actually received the loan.

Section 1691(a), on the other hand, is the statute's vehicle for proscribing discrimination on the basis of marital status. By both its terms and its function, it has broader application than the provisions to which Judge Colloton points. *Cf. Atl. Cleaners*, 286 U.S. at 435 ("A consideration of the history [of the ECOA] . . . sanctions the conclusion that Congress meant to deal comprehensively and

74

effectively with the evils resulting" from discrimination).  Indeed, it directly effects Congress's purposes in enacting the ECOA in the first place—preventing credit discrimination on the basis of marital status and allowing spouses to disentangle their credit from one another.  And its text, as I have noted, makes it applicable to "***any*** aspect" of a credit transaction.

That Judge Colton's citations are exclusively to other provisions of 15 U.S.C. § 1691 does not change this fact.  *See Hawkins*, 761 F.3d at 943–44 (Colloton, J., concurring).  "Most words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute *or even in the same section*."  *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (emphasis added) (citation and alteration omitted); *accord Gen. Dynamics*, 540 U.S. at 595-97 ("age" has different meanings in 29 U.S.C. § 623(a) and § 623(f) of the Age Discrimination in Employment Act of 1967); *Robinson*, 519 U.S. at 342–43 ("employee" has different meanings in different parts of 42 U.S.C. § 2000e–16(b) of Title VII of the Civil Rights Act of 1964); *see also Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 313–14 (2006) ("located" has different meanings in different sections of the National Bank Act).

But even if we were to hold that the term "applicant" as used throughout the statute includes guarantors, that is a better answer than the Majority Opinion's conclusion.  Judge Colloton's examples suggest that such an interpretation could

75

create unexpected benefits for guarantors.  That is preferable to gutting the statute's

reason for being.  The Majority Opinion's interpretation does not simply "limit[] the

achieving" of what Congress sought with the ECOA, Maj. Op. at 20 (citation

omitted); as I have explained, it "would be destructive of [the law's] purpose. . . ."

*Robinson*, 519 U.S. at 346.

So the Majority Opinion's analysis cannot carry the day.  "[T]he overriding

national policy against discrimination that underlies the [ECOA]" means that "we

cannot give" words in that statute a "narrow interpretation." *Bros. v. First Leasing*,

724 F.2d 789, 793 (9th Cir. 1984).  Instead, we must "construe the literal language

of the ECOA in light of the clear, strong purpose evidenced by the Act and adopt an

interpretation that will serve to effectuate that purpose." *Id.*; *see also United States

v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940) ("[W]hen the plain meaning did

not produce absurd results but merely an unreasonable one 'plainly at variance with

the policy of the legislation as a whole[,]' this Court has followed that purpose, rather

than the literal words.") (citation omitted).  Considering Congress's remedial

purposes in enacting the ECOA, as well as that the many definitions of "applicant"

do not exclude the possibility that an "applicant" includes a guarantor, we must

conclude that Congress's employment of the term "applicant" is ambiguous with

respect to whether it covers guarantors.  For this reason, we must conduct a *Chevron*

analysis of the Federal Reserve's answer to our question of whether the ECOA includes guarantors within the definition of "applicants."

## C.

Under *Chevron*, "we may not disturb an agency rule unless it is 'arbitrary or capricious in substance, or manifestly contrary to the statute.'" *Mayo Found. for Med. Educ. & Res. v. United States*, 562 U.S. 44, 53 (2011) (quoting *Pfennig*, 541 U.S. at 242). At bottom, then, we must ask whether the Federal Reserve's inclusion of guarantors in the ECOA's definition of "applicant" is a "reasonable interpretation" of the ECOA's text. *Chevron*, 467 U.S. at 844. The Federal Reserve's interpretation is reasonable for at least three reasons: it accords with the ECOA's text; it furthers a primary purpose of the ECOA; and, Congress has tacitly approved of the Federal Reserve's interpretation.

1. The Federal Reserve's inclusion of guarantors within the meaning of "applicants" is consistent with the ECOA's text.

First, guarantors fit within the plain meaning of "applicants." As I have noted, leading authorities recognize that guarantors apply to the creditor by asking it to extend credit to the primary debtor. *See supra* at 63.

The Majority Opinion's conclusion to the contrary rests on its premise that "[a]lthough a guarantor makes a promise related to an applicant's request for credit, the guaranty is not itself a request for credit." Maj. Op. at 12. But the Majority Opinion offers no support (beyond the Eighth Circuit's erroneous conclusion in

*Hawkins*) for the notion that the guarantor is not requesting that the creditor extend credit to the primary borrower. Not a treatise. Not an industry source. Not another statute. Not a dictionary. Not even something from the remote reaches of the internet. Instead, the Majority Opinion relies on its own understanding of credit markets.

But the Majority Opinion's own view—regardless of how learned and reasonable—of how terms are used in credit markets, does not control if the agency's interpretation is also reasonable. Indeed, "[t]he reviewing court may not substitute its judgment for that of the agency but must, instead, defer to the agency's technical expertise" if its interpretation is within the range of reasonableness. *Miami-Dade Cty. v. E.P.A.*, 529 F.3d 1049, 1065 (11th Cir. 2008) (citation and quotation marks omitted). And here, as I have noted, leading treatises and industry sources recognize that guarantors request credit. *See supra* at 63. Since the Federal Reserve's interpretation of the text is reasonable—not to mention well-supported—we must defer to it.

2. <u>The Federal Reserve's inclusion of guarantors within the meaning of "applicants" is consistent with primary purposes of the ECOA.</u>

Second, the Federal Reserve's interpretation is reasonable because covering "guarantors" fits squarely within the wheelhouse of the ECOA's aims. As I have noted, in enacting the ECOA, Congress sought to disentangle sex and marital status from credit. *See* Senate Rpt. at 16–17. Congress also set out "to prevent loans from

78

being conditioned automatically on the securing of the signature of the non-borrowing spouse." *Mayes*, 167 F.3d at 676.

The Federal Reserve's interpretation accounts for and respects these primary goals of the ECOA.  But not including guarantors within the definition of "applicants" yanks the teeth out of the ECOA.  *See supra* at 71–73.

3. <u>The Federal Reserve's inclusion of guarantors within the meaning of "applicants" is consistent with congressional abstention from amending the ECOA to preclude that interpretation, despite Congress's other amendments to the ECOA.</u>

Third, the Federal Reserve's interpretation of "applicants" to include guarantors is reasonable, in view of congressional action on the ECOA since its enactment in 1974.  The Supreme Court has instructed us to tread lightly where Congress has amended a statute but declined to disturb the agency's interpretation.

For instance, in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), the Court considered whether the statutory language authorized disparate-impact claims under the Fair Housing Act.  In conducting its analysis, the Court found it significant that Congress declined to alter the language at issue to preclude such claims, even though Congress had amended the statute after several Circuits had determined that the statute authorized such claims.  *Id.* at 2519.  Congress's inaction, the Court explained, was "convincing support for the conclusion that Congress accepted and ratified the unanimous holdings of the Courts of Appeals finding disparate-impact liability." *Id.*

79

at 2520; *see also Gen. Dynamics*, 540 U.S. at 593–94 & n.6 (noting that the two federal appellate courts and nearly all the district courts to consider the issue held that the Age Discrimination in Employment Act of 1967 did not prohibit favoring older employees over younger ones: "The very strength of this consensus is enough to rule out any serious claim of ambiguity, and congressional silence after years of judicial interpretation supports adherence to the traditional view.").

Here, Congress has tinkered with the ECOA no fewer than three times since 1985, when the Federal Reserve began construing the ECOA to include guarantors within the term "applicants." *See, e.g.*, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, §§ 1071, 1474, 124 Stat. 1376, 2056–57, 2199–2200 (2010); Omnibus Consolidated Appropriation Act, 1997, Pub. L. 104-208, § 2302, 110 Stat. 3009 (1996); Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. 102-242, §§ 212(d), 223, 105 Stat. 2236 (1991).

And up until 2014, when the Eighth Circuit issued *Hawkins*, the "vast majority of courts" that examined the issue found that guarantors had standing under the ECOA. *See RL BB*, 754 F.3d at 386. True, as the Majority Opinion notes, many of the cases deciding this issue offered little reasoning for their decisions. Maj. Op. at 25–26. But the Supreme Court does not require otherwise. While the Court acknowledged the judicial consensus of the interpretation of the Fair Housing Act in *Texas Department of Housing*, contrary to the Majority Opinion's characterization,

80

it did not require the lower courts' decisions to be "reasoned." Maj. Op. at 26. It noted simply that the courts that had "addressed" the issue had consistently come out the same way. *Tex. Dep't of Hous.*, 135 S. Ct. at 2519. And most of the cases the Court referenced were *not* particularly well-reasoned; they just adopted what other circuits had done. *See, e.g.*, *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) (noting and adopting analysis from other circuits that Fair Housing Act violations can be proven with a showing of discriminatory effect); *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 574–75 (6th Cir. 1986) (same); *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1559, n.20 (11th Cir. 1984) (same); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982) (same); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982) (same).

The more important point, though, is that Congress has long been on notice as to how federal courts have interpreted the ECOA and Regulation B. And with that knowledge in hand, Congress amended the law multiple times and never considered tweaking the ECOA to abrogate these courts' approval of the Federal Reserve's interpretation. Even after the Seventh Circuit issued *Moran*, in which a Court of Appeals—for the first time—voiced doubts in dicta about the Federal Reserve's interpretation, Congress left the ECOA's definition of "applicant" the same, even though it substantively amended the ECOA three years later, in 2010. So Congress declined to take the Seventh Circuit up on its invitation to cap the

81

supposed "vistas of liability" that the Seventh Circuit concluded Congress was "unlikely to accept." *Moran*, 476 F.3d at 441. Congressional inaction on this point in the face of thirty years of uniformity "supports adherence to the traditional view," *Gen. Dynamics,* 540 U.S. at 594, that the Federal Reserve's inclusion of guarantors within the term "applicants" is valid.

## III.

We should dismiss this case because it is not properly before us. The Majority Opinion's insistence on "resolving" a claim that no Appellant has presented to us renders its discussion of the ECOA unnecessary. But because that discussion incorrectly purports to truncate the ECOA's broad reach, it leaves me no choice but to respond. Unfortunately, the Majority Opinion's analysis artificially limits the definitions of "applicant" and "guaranty"; it conflicts with congressional aims in enacting the ECOA; and it is rebutted by Congress's failure to amend the ECOA to make guarantors fall outside the meaning of "applicants," in the 34 years since the Federal Reserve has construed the term "applicants" to include guarantors. Ultimately, the Majority Opinion's interpretation of the ECOA ironically allows lenders to get away with discriminating on the basis of sex or marital status, the very thing the ECOA meant to eliminate. I therefore respectfully dissent.

Appendix A

## DOCKET NO. 17-11736

# United States Court of Appeals

*for the*

# Eleventh Circuit

REGIONS BANK, an Alabama state chartered bank,

*Plaintiff/Appellee,*

*v.*

LEGAL OUTSOURCE PA, a Florida professional association; PERIWINKLE PARTNERS, LLC, a Florida limited liability company; CHARLES PT PHOENIX, individually, a.k.a. Charles PT Phoenix; LISA M. PHOENIX, individually,

*Defendants/Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE NO: 2:14-cv-00476-PAM-MRM
(Hon. Paul A. Magnuson)

## INITIAL BRIEF OF APPELLANTS

JOHN M. DUGGAN
DERON A. ANLIKER
JAY T. SHADWICK
DUGGAN SHADWICK DOERR &
KURLBAUM LLC
11040 Oakmont Street
Overland Park, KS 66210
(913) 498-3536

CHARLES PT PHOENIX
RHODES TUCKER PHOENIX
2407 Periwinkle Way, Suite 6
Sanibel, FL 33957
(239) 472-1144

JASON W. GRAHAM
GRAHAM & JENSEN, LLP
17 Executive Park Drive, Suite 115
Atlanta, GA 30329
(404) 842-9380

*Counsel for Plaintiff/Appellant*

## STATEMENT OF THE ISSUES

1. As a fundamental issue of procedural due process, can a district court enter blanket judgment against all parties on all counts in a complaint when the plaintiff sued a particular defendant, for example, on only one (1) of the six (6) alleged claims?

2. Were there genuine disputes on issues of material fact precluding summary judgment where the district court finds that the defendants "do not dispute that they were in default under the relevant notes and guaranties" despite the presentation of conflicting evidence on each material issue?

3. If a lender's initial acceleration of a mortgage is wrongful, and hence a breach of the mortgage note, is the borrower excused from further performance until after the wrongfully accelerated note is decelerated and the borrower is permitted to resume normal payments?

4. Does a wife who refuses to collateralize loans or guaranty her husband's unsecured business debt have Equal Credit Opportunity Act (ECOA) standing as an "applicant" to sue if the lender then forces over a dozen technical defaults as pretense to falsely accelerate and foreclose on her separate secured loan?

5. If Congress did not precisely answer whether "applicant with respect to any aspect of a credit transaction" includes persons liable for the applied-for loan

1

as guarantors, did the Federal Reserve Board have authority under ECOA to include by regulation spousal guarantors as "applicants" to further the purposes of eliminating discrimination against married persons?

inspecting the public records available on the Lee County (Florida) Tax Collector's website.

## V.    Equal Credit Opportunity Act

In a dizzying effort to substantiate dismissing Lisa Phoenix's and Periwinkle's claims, the District Court relied exclusively on the Eighth Circuit's ruling in *Hawkins v. Community Bank of Raymore*, 761 F.3d 937 (8th Cir. 2014) which stated that "[i]f [the spouses] do not qualify as applicants, then [the lender] did not violate the ECOA" Stated differently, even though ECOA and Regulation B prohibit requiring spouses to collateralize, co-sign, or guaranty debts, Regions asserts that lenders are not liable because the persons required to collateralize or co-sign the debts cannot sue.

In short, according to the District Court, the ECOA and Regulation B spousal discrimination prohibition, which has remained unchallenged for over forty years, is now a nullity. According to the District Court, *Hawkins* grants lenders an untethered license to require spouses to collateralize and sign for their husbands' loans with impunity.

This flawed reading of the ECOA eviscerates the black letter principle that illegal contracts are unenforceable. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 78 (1982); *Silverman v. Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28, 33 (3rd Cir. 1995); *United States v. Meadors*, 753 F.2d 590, 593 (7th Cir. 1985); *Kline,*

30

782 N.W.2d at 461; *Eure*, 448 S.E.2d at 419; *Boone*, 47 S.W.3d at 375; *King v. Moorehead*, 495 S.W.2d 65, 77 (Mo. Ct. App. 1973).   If the District Court is upheld, persons being sued in federal court to enforce illegal guaranties violating ECOA cannot defend against the illegal guaranties' enforcement anda guarantor is not protected from marital-status discrimination by the ECOA even though the contract violates the its signature prohibitions.

Congress expressly delegated authority to the FRB to "prescribe regulations" that "in the judgment of the [FRB] are necessary or proper to effectuate the purposes" of ECOA, "to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." 15 U.S.C. § 1691b(a).  It is well-settled that the agency's interpretation of the statute it is charged to administer is entitled to great deference.  In Regulation B's forty years, Congress has not amended this spousal guaranty prohibition.   In fact, Congress amended ECOA in 2010, reaffirming that FRB regulations carry the force of law.  15 U.S.C. § 1691a(g) ("Any reference to any requirement imposed under this subchapter or any provision thereof includes reference to the regulations of the Bureau under this subchapter or the provision thereof in question.").The Supreme Court has concluded that "congressional failure to revise or repeal the agency's [statutory] interpretation is persuasive evidence that the interpretation is the one intended by Congress."  *Young v. Cmty. Nutrition Inst.*, 476 U.S. 974, 983 (1986) (quoting

31

*N.L.R.B. v. Bell Aerospace, Co.*, 416 U.S. 267, 275 (1974)). Here, Regions has not challenged the FRB's § 202.7(d) prohibition against requiring spouses to collateralize, co-sign, or guaranty debts. Indeed, the Eighth Circuit did not consider the FRB's authority under § 202.7(d) either. *See, generally, Hawkins*, 761 F.3d 937. Other courts have universally acknowledged this valid spousal signature prohibition. *RL BB Acquisition*, 754 F.3d at 383; *Silverman*, 51 F.3d at 33; *Kline*, 782 N.W.2d at 458-62; *Boone*, 47 S.W.3d at 373-75.

Lisa Phoenix and Periwinkle claim Regions required them to sign for and collateralize her husband's business debts hence violating ECOA prohibitions. These claims fall squarely within ECOA's protections.

## CONCLUSION

As this Court should be able to discern from the foregoing, the district court denied Appellants their right to a trial on disputed facts – even a bench trial – by effectively bench trying the case on motions. The district court resolved disputed issues of material fact in favor of the movant Appellee without giving the standard deference to the non-movant. The clearest error was the awarding of unrequested relief against parties to which said relief did not even apply. The district court ignored conflicting evidence submitted by Appellants in opposition to summary judgment. Despite acknowledging the technical nature of the purported

32